**FAMILIES ACHIEVING INDEPEN-
DENCE & RESPECT; Sheryl Walker;
and Vicki Stippel, Plaintiffs,**

v.

**NEBRASKA DEPARTMENT OF SOCIAL
SERVICES; Mary Dean Harvey; Ann
Hogan; Daryl Wusk; and Suzy Skinner,
Defendants.**

No. 4:CV95–3121.

United States District Court,
D. Nebraska.

June 20, 1995.

Sharon M. Lindgren, Elizabeth A. Sterns, Ugai & Lindgren, Lincoln, NE, for plaintiffs.

Don Stenberg, Atty. Gen., Michael J. Rumbaugh, Sp. Asst. Atty. Gen., Royce N. Harper, Asst. Atty. Gen., Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER PURSUANT TO RULE 52(a)

KOPF, District Judge.

Plaintiffs, a welfare-rights association and two of its staff members, sue to gain access to the waiting/reception area of a state-operated welfare office for the purpose of talking to welfare recipients and distributing and posting materials regarding their views on welfare reform. Defendants have denied Plaintiffs access to the area for this purpose. Finding that the waiting/reception area is not a public forum of any kind, that Defendants' regulation of Plaintiffs' speech is otherwise reasonable, and that such regulation is not an effort to suppress the speakers' activities due to a disagreement with their views, I shall enter judgment for Defendants and against Plaintiffs.

Pursuant to Federal Rule of Civil Procedure 52(a), I now enter the findings of fact and conclusions of law that have informed my decision.

### I. FACTS

The facts are essentially undisputed. After a consolidated bench trial and hearing on the request for preliminary injunction, *see* Fed.R.Civ.P. 65(a)(2), I find the material facts to be these:

#### The Parties

1. FAMILIES ACHIEVING INDEPENDENCE AND RESPECT (FAIR) is a project of the Nebraska Center for Legal Services. (Ex. 3.) It is a self-styled educational support group for low-income persons which seeks, among other things, "to more fully inform the public discussion and debate on the 'welfare system' and 'welfare reform.'" (*Id.,* Funding Proposal at 1.) FAIR obtains its funding from the Woods Charitable Fund. (*Id.*) FAIR registered as a lobbyist in the State of Nebraska in the spring of 1994, but by the time of trial, it had withdrawn its registration after a lawyer with the Nebraska Center for Legal Services determined that FAIR could carry on its activities without registration. (Tr. 39:2–41:18.)

2. FAIR has no membership list per se and is not incorporated. (Tr. 16:13–24.) FAIR has two staff members who are the other named plaintiffs in this case, and they receive "scholarships" in lieu of "pay." (Tr. 15:11–25.)

3. Together with other groups such as the Nebraska Democratic Women, FAIR sponsored a rally at the Nebraska State Capitol Building in February, 1995, that was intended to "Stop the War on Poor Children," and a flier was prepared for that purpose, noting the sponsorship of FAIR and the other entities. (Ex. 5.) FAIR also prepared a flier outlining its views on welfare reform. (Ex. 4.) In addition, FAIR prepared a post card that included a child's hand print, space for a child's name and age, and "facts" about welfare and poverty printed on the reverse side. (Ex. 6.) After completion by a welfare recipient, the post card was intended for delivery to state senators. (Tr. 56:20–24.) These were the documents FAIR and the other plaintiffs wanted to talk about, distribute, and post at the welfare office. (Tr. 55:23–57:2.)

4. SHERYL WALKER (Walker), one of the individual named plaintiffs, receives "ADC," "Medicaid and food stamps." (Tr. 44:19–45:2; Ex. 1 ¶ 8.) VICKI STIPPEL (Stippel), the other individual named plaintiff, likewise receives "ADC" and "food stamps and Medicaid." (Tr. 77:8–18; Ex. 1 ¶ 9.) Walker is FAIR's "project facilitator," and Stippel is the "project assistant." (Tr. 15:13–17.)

5. The NEBRASKA DEPARTMENT OF SOCIAL SERVICES (NDSS) is an agency of the State of Nebraska which provides assistance to low-income individuals and families, and it maintains a local office in Lincoln, Nebraska. (Ex. 1 ¶ 1.) NDSS also maintains a central office in Lincoln, Nebraska. (*Id.*) MARY DEAN HARVEY (Harvey) is the director of NDSS, and ANN HOGAN (Hogan) is an NDSS employee located at the central office. (*Id.* ¶¶ 2,3.)

6. DARYL WUSK (Wusk) is the administrator of the local NDSS office in Lincoln, Nebraska. (*Id.* ¶ 4.) SUZI SKINNER (also known as Suzy Skinner) (Skinner) is an NDSS employee at the local office in Lincoln, Nebraska, and she is Wusk's assistant. (*Id.* ¶¶ 5, 10.)

7. It is stipulated that all individual defendants acted in their official capacities. (*Id.* ¶ 7.) It is further stipulated that Hogan and Skinner made no decisions, but simply served to relay messages to and from Harvey and Wusk. (Ex. 101.)

**The Place**

8. The local offices of NDSS are on the second floor of a commercial building operated and managed by a private entity. (Ex. 2, Trial Ex.) As opposed to the central office of NDSS, where it might reasonably be assumed that public policy would be formulated and perhaps debated, there is no evidence in this record that the local office of NDSS formulates or debates public policy. On the other hand, while there is no evidence that it makes or debates policy, the local office does provide a broad range of services to welfare recipients. As Wusk explained, "Our agency is not only involved in maintenance … like food stamps and ADC and Medicaid, but we also are a complete service office that has child welfare and adult protective services and the whole menagerie, if you will, of Social Service programs…." (Tr. 132:13–23.) As a "complete service office," welfare recipients are registered to vote in the office. (Tr. 149:23–150:4.)

9. The enclosed waiting/reception area of the local NDSS office is one large rectangular room comprised of (a) a reception area on the east side of the room, with space on the north side for a receptionist and bathrooms; (b) a food-stamp-issuance counter with approximately three "teller" stations located on the south side of the reception area; and (c) a waiting area on the west side of the room, with client interview rooms surrounding most of the waiting area of the room. (Ex. 2, Trial Ex. (attached drawing); Ex. 7 (video tape); Ex. 2, T.R.O. Hr'g (photos).) One enters and exits the local NDSS office and the waiting/reception area from the east by passing through a small lobby and closed doors. (*Id.*) The waiting area is roughly twice the size of the reception area. (*Id.*) While the reception area does not contain seating, the waiting area does have seats. (Ex. 7 (video

tape); Ex. 2, T.R.O. Hr'g (photos).) Located in the reception area adjacent to, and not far from, the food-stamp-issuance counter are two small bulletin boards with a table positioned in front of them. (*Id.*) The evidence establishes that the bulletin boards are devoted almost exclusively to social-service notices regarding jobs and related information. (Ex. 2, T.R.O. Hr'g (photos); Tr. 132:1–7.) A client desiring an interview in the privacy of a client interview room would walk directly from the waiting room into an interview room without traversing any barrier save for the door to the interview room. (Ex. 2, Trial Ex. (attached drawing).) There is a table in the waiting area. (Ex. 7 (video tape); Ex. 2, T.R.O. Hr'g (photos).) A uniformed security guard sits at the table in the waiting area and provides security during working hours. (Tr. 128:17–18.) A welfare recipient could not normally enter or exit this waiting/reception area, or any other area of the office, without passing by the bulletin boards and table situated in the reception area of the room. (Ex. 2, Trial Ex. (attached drawing); Ex. 7 (video tape); Ex. 2, T.R.O. Hr'g (photos).)

10. During the first five days of the month, the local NDSS office and the area in dispute are especially busy because food stamps are issued to 1,920 households "over the counter" in the reception area. (Tr. 120:2–24.) In addition to the food-stamp-issuance activity that takes place in the reception area, the waiting area is used by people waiting to receive food stamps or be interviewed in the adjoining client interview rooms regarding the myriad of details associated with the provision of welfare benefits. (Tr. 120:12–20.) Without contradiction, Wusk described the waiting/reception area as a "high traffic area." (Tr. 120:20.)

11. The private entity that manages the building where the local NDSS office is situated will not allow Plaintiffs to hand out their materials in the common areas of the building. (Ex. 2.) Nor will the building's management allow Plaintiffs to use the lobby adjacent to the waiting/reception area for the purpose of handing out their materials. (Ex. 2.) There is no evidence, and no claim, that NDSS prompted the building's management to take this position.

12. Plaintiffs have in the past handed out their materials on the sidewalk adjoining the building where the local NDSS office is situated, but a police officer would not permit Plaintiffs to use a table. (Tr. 63:16–66:2.) Plaintiffs do not contend that Defendants are responsible for the action taken by the police officer. (*Id.*) Plaintiffs have also been allowed to hand out their materials from tables in the first floor rotunda of the State Capitol Building (which is a few blocks from the local office of NDSS). (Tr. 69:16–71:18.)

### The Problem

13. On or about January 26, 1995, Stippel telephoned the local office of NDSS, located in Lincoln, Nebraska, and spoke to Skinner, an assistant to Wusk, administrator of the Lancaster County office of NDSS. (Ex. 1 ¶ 10.)

14. Stippel informed Skinner that FAIR wanted to have one or two of its members in the waiting room/reception area [1] of the Lancaster County office of the Department of Social Services the first three days of February, 1995, to talk to welfare recipients when they came to the office to pick up food stamps and conduct other business at the Lancaster County office of NDSS and to distribute pamphlets informing welfare recipients of the existence of FAIR and of a rally that FAIR had scheduled for February 14, 1995. (*Id.* ¶ 11.)

15. After January 26, 1995, other organizations were allowed in the waiting room/reception area of the Lancaster County NDSS office. (Ex. 1 ¶ 12.)

16. On January 26, 1995, at Skinner's request, Stippel went to the Lancaster County NDSS office and met Skinner in the waiting room/reception area. At that time, Stippel gave Skinner copies of the materials FAIR

---

1. At trial, Walker stated that the group wanted to sit at the table in front of the bulletin boards. (Tr. 53:8–16.) However, the record does not clearly indicate that Plaintiffs explicitly told Defendants they wished to sit at the table. I am satisfied that Wusk's decision would have been the same even if Plaintiffs had specifically limited their request to sitting at the table, talking to those assembled, and distributing literature. (Tr. 149:13–17.)

wanted to distribute, and Skinner told Stippel that she did not believe there would be a problem with the representatives of FAIR distributing pamphlets in the waiting room/reception area of the Lancaster County NDSS office, but Skinner needed to discuss the matter with Wusk, administrator of the Lancaster County office of NDSS. (*Id.* ¶ 13.)

17. On January 27, 1995, Walker received a telephone call from Skinner. During that conversation, Skinner informed Walker that FAIR would not be allowed to have representatives in the waiting room/reception area of the Lancaster County NDSS office at the first of the month to talk to the welfare recipients and to distribute pamphlets informing welfare recipients of the existence of FAIR and of a rally that FAIR had scheduled for February 14, 1995. (*Id.* ¶ 14.)

18. The only reason given for prohibiting FAIR from being present in the waiting room/reception area of the Lancaster County NDSS office and distributing pamphlets was that FAIR did not provide a "direct benefit" to the welfare recipients. (*Id.* ¶ 15.)

19. On January 27, 1995, Hogan telephoned Stippel and informed her that Harvey would not allow FAIR to have representatives in the waiting room/reception area of the Lancaster County NDSS office for the first three days of February, 1995. Hogan summarized the policy, including examples of other groups who offered a direct benefit to welfare recipients, in her explanation. (*Id.* ¶ 16.)

20. On February 1, 1995, Walker and Stippel arrived at the Lancaster County NDSS office at approximately 8:45 a.m. (*Id.* ¶ 17.)

21. After arriving at the Lancaster County NDSS office, Walker and Stippel went to the reception desk to inform the staff that they were present and wanted to talk to the welfare recipients in the waiting room/reception area and distribute pamphlets on behalf of FAIR. (*Id.* ¶ 18.)

22. Skinner met Walker and Stippel and three other persons in the waiting room/reception area of the Lancaster County NDSS office. (*Id.* ¶ 19.)

23. Skinner informed Walker and Stippel that they would not be allowed in the waiting room/reception area of the Lancaster County NDSS office to talk to the welfare recipients or distribute pamphlets because, unlike the other groups that had been allowed to talk to welfare recipients in the waiting room/reception area and distribute information, FAIR did not provide a "direct benefit" to the welfare recipients. (*Id.* ¶ 20.)

24. During the conversation on February 1, 1995, Walker asked Skinner if one of the pamphlets from FAIR could be placed on a bulletin board in the waiting room/reception area of the Lancaster County NDSS office which was used by various organizations to provide information to welfare recipients, and Skinner informed Walker that she would have to ask about that. (*Id.* ¶ 21.)

25. Subsequently, Walker and Stippel were informed by Skinner that the FAIR brochure could not be placed on the bulletin board in the waiting room/reception area of the Lancaster County NDSS office because FAIR did not provide a "direct benefit" to welfare recipients. (*Id.* ¶ 22.) Exhibit 5, soliciting persons to attend the FAIR rally, was the document Plaintiffs wished to place on the bulletin board. (Tr. 130:24–131:12.)

26. After being told they would not be allowed to remain in the waiting room/reception area of the Lancaster County NDSS office to talk to welfare recipients and distribute pamphlets regarding FAIR and the rally scheduled for February 14, 1995, Walker and Stippel left voluntarily, without causing a disturbance. (Ex. 1 ¶ 23.)

### The Policy

27. NDSS did not have a specific policy dealing with Plaintiffs' request, so Wusk developed his own policy over the years. (Tr. 118:8–25.)

28. Wusk's policy, which was not in writing, was to resist opening the waiting/reception area "up for the world." (Tr. 120:21–22.) Indeed, the policy was to "minimize the numbers of groups" allowed access "as much as possible." (Tr. 150:15–151:3.)

29. There were two specific prongs to Wusk's general policy of keeping the waiting/reception area closed: (a) "advocacy

groups," regardless of whether Wusk agreed or disagreed with the group's message,[2] were never allowed access to the waiting/reception area for advocacy purposes (Tr. 118:16–120:24); and (b) only groups that provided a "direct benefit" associated with the "basic needs of our customers" were allowed access to the waiting/reception area. (Tr. 120:25–123:23; 150:3–22.)

30. Over the years, only four groups had been allowed access to the waiting/reception area in order to hand out materials to welfare recipients. Those groups were (a) volunteers who assist welfare recipients in the preparation of state and federal income tax returns;[3] (b) persons seeking to register children of welfare recipients for the preschool "Head Start Program"; (c) representatives of a food and nutrition program of the county extension office handing out literature related to good nutrition, such as recipes; and (d) persons offering to register welfare recipients for English as a second language or the "GED" program at a local public community college. (Tr. 120:25–123:23.)[4] Wusk added that if FAIR intended to provide nutritional information like the county extension service, he would allow FAIR access to the office for that purpose. (Tr. 151:8–16.)

31. Wusk has turned down requests for access to the waiting/reception area by such groups or institutions as a Wesleyan University social-work class; the Lincoln School of Commerce (a for-profit educational institution); "Mad Dads"; "Journey" (a Native American health rights group); a "Right–to–Life" group; and various University of Nebraska–Lincoln research groups. (Tr. 125:15–127:7.)

32. Wusk had two reasons for implementing this policy. First, Wusk believed that since NDSS customers are required to go to the local office of NDSS to obtain the necessities of life, such as food, "we need to treat them with dignity" and not force NDSS customers to encounter individuals promoting a particular political point of view in order to obtain the necessities of life. (Tr. 119:8–120:2.) Second, because it is "a high traffic area" that is often "very hectic," allowing outside groups into the waiting/reception area could cause administrative difficulties, such as congestion while people are standing in line at the food-stamp-issuance counters. (Tr. 120:2–24; 127:7–129:7.)

33. NDSS had no policy concerning bulletin boards, and Wusk developed a similar unwritten policy regarding the bulletin board. (Tr. 131:19–133:15.) Essentially, Wusk prohibited advocacy groups from using the bulletin board (which is in reality two small bulletin boards) located in the reception area. (Id.) Wusk did allow job openings to be posted on one side of the bulletin board, and other "direct-benefit" "basic-need" notices (like housing notices, free-used-refrigerator notices, and "emotional-needs"

---

2. There was an indirect suggestion by a legal services lawyer that Wusk may have rejected Plaintiffs' request because NDSS supported "welfare reform" and Plaintiffs opposed "welfare reform." (Tr. 22:7–10.) Wusk explicitly denied the suggestion, noting that the only reason NDSS's position on welfare reform had been discussed was because the lawyer first raised the issue when the lawyer called Wusk to complain on behalf of FAIR. (Tr. 116:19–117:17.) Wusk testified that even if Plaintiffs had been supporting welfare reform, the decision would still have been the same. (Tr. 117:18–21.) Indeed, Wusk testified, without any evidence to the contrary, that he enforced the ban without regard to whether he agreed or disagreed with the message of the speaker. (Tr. 134:10–16.) For example, Wusk testified that he denied access to the "Mad Dads," a group he belonged to and otherwise supported, because it was an advocacy group. (Tr. 140:17–25.) I find and conclude the only credible evidence was that Wusk (and the other defendants) enforced the ban regardless of whether Wusk (or the other defendants) agreed or disagreed with the message of the speaker.

3. Given the fact that under the Internal Revenue Code "an earned income credit (EIC) is granted for eligible low-income workers to supplement their income," Moore v. Miller, 579 F.Supp. 1188, 1190 (N.D.Ill.1983) (policy of crediting earned income credit as "income" for welfare purposes, thus reducing benefits, was unconstitutional), it is obviously consistent with the mission of NDSS to provide welfare recipients with knowledge about how to prepare a tax return.

4. Wusk specifically denied allowing the Girl Scouts access to the waiting/reception area to hand out materials, although he indicated that various groups like the Girl Scouts may have toured the office from time to time. (Tr. 124:13–21.) I credit Wusk's testimony on this point.

notices) on the other side of the bulletin board. (*Id.*)

## II. LAW

The parties raise three issues regarding the foregoing facts: (1) whether FAIR has standing; (2) whether Wusk's policy, supported by Harvey and NDSS, violated Plaintiffs' First Amendment right of free speech; [5] and (3) whether Wusk's policy, supported by Harvey and NDSS, violated Plaintiffs' Fourteenth Amendment right to equal protection of the law. I turn to these issues next.

### A. Standing

 FAIR claims standing in this case on behalf of its members. Defendants argue that FAIR does not have standing to bring this action because it has no membership list; therefore, it cannot be determined whether FAIR has standing on behalf of its members.

While it may have no formal membership list, FAIR does have at least two "members," Walker and Stippel, who have standing to sue in their own right. Accordingly, the first prong of the three-part test of standing set forth in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (discussing standing of an association allegedly derived from claimed injury to members), is

**5.** In this connection, I hasten to note that I am *not* asked to decide whether Defendants could prevent Walker and Stippel from exercising their First Amendment right of free speech while they were in the local office as welfare recipients on personal business regarding their welfare benefits. Moreover, there is no evidence that Walker or Stippel were ever prevented from exercising their First Amendment free speech rights when they were in the office on personal business related to their welfare benefits.

**6.** The three-part test of an association's standing to sue includes (a) whether its members would otherwise have standing to sue in their own right; (b) whether the interests the association seeks to protect are germane to its organizational purpose; and (c) that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

**7.** To the extent Defendants contend that FAIR must have some particular type of formal legal structure (such as the corporate form) in order to have standing, I disagree as I find no precedent for such a holding. In fact, the cases "reflect little concern" on this issue, and the "general lack of attention to such matters may reflect the

clearly satisfied.[6] The second and third prongs of the *Hunt* test are not in dispute, and they are satisfied in any event.[7] Accordingly, I find and conclude that FAIR has standing to bring this action on behalf of Walker and Stippel.[8]

### B. Free Speech

 It is uncontested, and I so find and conclude, that Plaintiffs' activity in this case is expressive activity otherwise protected by the Free Speech Clause of the First Amendment. *See, e.g., McIntyre v. Ohio Elections Comm'n*, —— U.S. ——, ——, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 (1995) (in the context of an election law that banned anonymous campaign literature, the Court observed that "handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression"); *Albany Welfare Rights Org. v. Wyman*, 493 F.2d 1319 (2d Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (blanket denial to welfare organization to hand out leaflets at welfare office violated First Amendment). *Cf. New York City Unemployed & Welfare Council v. Brezenoff*, 677 F.2d 232 (2d Cir.1982) (although leafleting was protected by the First Amendment, regulations instituted at welfare office were valid time, place, and manner restrictions).[9]

fact that there are few problems." 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.9, at 617 (1984). In this connection, I observe that the structure of the association in this case was sufficiently precise that a charitable foundation thought it appropriate to advance funds to the association. Still further, the structure of the association was sufficiently precise that it was, at one time, registered as a lobbyist with the State of Nebraska. I am therefore satisfied that the mere lack of a formal legal structure, such as the corporate form, does not warrant an adverse ruling on the question of standing in this case.

**8.** The fact that Walker and Stippel are named plaintiffs obviously makes this finding nearly irrelevant.

**9.** The parties have concentrated on the issue of handing out "fliers," but the evidence indicates that Plaintiffs wanted to (1) hand out fliers; (2) post at least one flier on the bulletin board; and (3) talk to welfare recipients (whether from a desk in front of the bulletin boards and adjacent to the food-stamp-issuance lines or otherwise) about the issues raised in the fliers. Thus, each

■ However, "property owned or controlled by the government which is *not* a public forum may be subject to prohibition of speech, leafleting, picketing, or other forms of communication without running afoul of the First Amendment." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981). Thus, where the public property is not a public forum, "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1982).

In this case, involving government property as it does, the dispositive issue is twofold: (1) what level of judicial scrutiny should be accorded the restrictions placed upon Plaintiffs' expressive activity by Defendants; and (2) whether the regulation of Plaintiffs' expressive activity by Defendants will survive the appropriate level of judicial scrutiny. The answer to these questions is largely controlled by two opinions of the United States Supreme Court authored in 1992. *See International Soc'y for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (holding that ban on solicitation in publicly operated airport did not violate the First Amendment) (*Lee I*); *Lee v. International Soc'y for Krishna Consciousness, Inc.,* —— U.S. ——, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992) (per curiam) (holding that ban on distribution of literature in publicly operated airport did violate the First Amendment) (*Lee II*).

Although these two opinions reflect a somewhat divergent set of views by the Justices on the First Amendment as applied to the regulation of speech in public buildings, there is sufficient agreement among the Justices that relevant principles can be distilled from *Lee I* and *Lee II.* Accordingly, I shall state the relevant principles as I understand them, and then apply those principles to the facts of this case.

### 1. The *Lee* Principles

#### a. Forum Definition Determines Level of Scrutiny

Airports in New York are operated by a public body. *Lee I,* —— U.S. at —— – ——, 112 S.Ct. at 2703–04. Airport terminals are open to the public and contain various commercial establishments such as bars, newsstands, and stores of varying types. *Id.* Among other things, the public body that operated the terminals prohibited the solicitation of funds or the distribution of fliers (and the like) in the terminal corridors. *Id.*

I shall initially examine the decision in *Lee I.* Speaking for Justices White, Scalia, Thomas, and O'Connor, Chief Justice Rehnquist first noted that there are types of "forums" recognized by the Court and that each warrants a peculiar type of judicial scrutiny:

> Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject. *Kokinda, supra,* 497 U.S., at 725, 110 S.Ct., at 3118 (plurality opinion) (citing *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961)). Thus, we have upheld a ban on political advertisements in city-operated transit vehicles, *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), even though the city permitted other types of advertising on those vehicles. Similarly, we have permitted a school district to limit access to an internal mail system used to communicate with teachers employed by the district. *Perry Education Assn. [sic] v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

> These cases reflect, either implicitly or explicitly, a "forum-based" approach for assessing restrictions that the government seeks to place on the use of its property. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Under this approach, regulation of

of these three elements collectively constitute the

expressive conduct at issue.

speech on government property that has traditionally been available for public expression is subject to the highest scrutiny. Such regulations survive only if they are narrowly drawn to achieve a compelling state interest. *Perry, supra,* 460 U.S., at 45, 103 S.Ct., at 955. The second category of public property is the designated public forum, whether of a limited or unlimited character—property that the state has opened for expressive activity by part of all of the public. *Ibid.* Regulation of such property is subject to the same limitations as that governing a traditional public forum. *Id.,* at 46, 103 S.Ct., at 955. Finally, there is all remaining public property. Limitations on expressive activity conducted on this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view. *Ibid.*

The parties do not disagree that this is the proper framework.
*Lee I,* —— U.S. at ——-——, 112 S.Ct. at 2705–06.

Applying this framework, Chief Justice Rehnquist found that the ban on solicitation in airport terminals did not violate the First Amendment because (a) the airport terminal was not a public forum inasmuch as (i) airport terminals historically had not been considered public forums, and (ii) the operators had not intentionally opened the terminals for speech activity; (b) since the terminal was not a public forum, the ban need only be reasonable to withstand constitutional scrutiny provided it was not an effort to suppress the speaker's activity due to a disagreement with the speaker's views; and (c) the ban on solicitation was reasonable because of the potential for disruption and there was no evidence that it was intended to suppress speech because of a disagreement with the views of the speaker. *Id.,* —— U.S. at ——-——, 112 S.Ct. at 2705–09.

Justice O'Connor concurred in *Lee I,* emphasizing that the case was unusual because "[o]rdinarily, this inquiry [regarding the type of forum] is relatively straightforward, be-

cause we have almost always been confronted with cases where the fora at issue were discrete, single-purpose facilities." *Id.,* —— U.S. at ——, 112 S.Ct. at 2712. Although explicitly agreeing with Chief Justice Rehnquist that the airport terminal was a nonpublic forum, *id.,* —— U.S. at ——, 112 S.Ct. at 2711, Justice O'Connor added that the test of "reasonableness" turned not on whether the restriction was reasonable from the perspective of preserving the property for air travel alone, but whether the restriction was reasonable for a "multipurpose environment that the Port Authority has deliberately created." *Id.,* —— U.S. at ——, 112 S.Ct. at 2713. Justice O'Connor concluded that the solicitation ban was reasonable even in a multipurpose environment because airport passengers faced time constraints. *Id.*

Justice Kennedy concurred in *Lee I,* although he found that "the airport corridors and shopping areas outside of the passenger security zones, areas operated by the [public body], are public forums." *Id.,* —— U.S. at ——, 112 S.Ct. at 2715. Justice Kennedy believed that the definition of a forum turned on an "objective" test "based on the actual, physical characteristics and uses of the property," not on whether the property historically had been dedicated to expressive activity or whether the government had dedicated the property to expressive activity. *Id.,* —— U.S. at ——, 112 S.Ct. at 2716. Justice Kennedy defined a public forum this way: "If the objective, physical characteristics of the property at issue and the actual public access and uses which have been permitted by the government indicate that expressive activity would be appropriate and compatible with those uses, the property is a public forum." *Id.,* —— U.S. at ——, 112 S.Ct. at 2718. His test was comprised of three parts: (a) a comparison of the physical similarities of the subject property with traditional public forums; (b) a determination of whether the government has permitted or acquiesced in broad public access to the forum; and (c) a determination of whether expressive activity is compatible with the uses to which the government has as a factual matter dedicated the property. *Id.,* —— U.S. at ——, 112 S.Ct. at 2718.

Although the terminal was a public forum according to Justice Kennedy, the ban on solicitation was constitutional as a reasonable time, place, and manner restriction or a reasonable regulation directed at conduct. *Id.,* —— U.S. at —— – ——, 112 S.Ct. at 2720–24.

Justices Souter, Blackmun, and Stevens agreed with Justice Kennedy's approach to the forum-definition question, but reasoned that the ban on solicitation was not sufficiently narrowly tailored to further a significant governmental interest and therefore violated the Constitution. *Id.,* —— U.S. at —— – ——, 112 S.Ct. at 2724–25.

I shall next examine *Lee II.* In a per curiam opinion based upon the concurring opinions of Justices O'Connor, Kennedy, and Souter in *Lee I,* the Court held that the ban on distribution of fliers violated the First Amendment. *Id.,* —— U.S. at ——, 112 S.Ct. at 2710.

Justice O'Connor reasoned that even though the terminal was not a public forum, the ban on distribution of fliers was unreasonable given the fact that the airport in effect operated a "shopping mall as well as an airport." *Id.,* —— U.S. at ——, 112 S.Ct. at 2713. Thus, it was "difficult to point to any problems intrinsic to the act of leafleting that would make it naturally incompatible with a large, multipurpose forum such as those at issue here." *Id.,* —— U.S. at ——, 112 S.Ct. at 2714.

Justice Kennedy reasoned that the terminal was a public forum because (a) the property shared physical similarities to other public forums (such as streets); (b) the government had permitted broad public access to the forum (over 78 million people traveling through the airport authority's three airports); and (c) expressive activity would not tend to interfere in a significant way with the uses to which the government had as a factual matter dedicated the property (as evidenced by, among other things, the fact that a federal agency allowed expressive activity in the airports of the nation's capital). *Id.,* —— U.S. at —— – ——, 112 S.Ct. at 2718–19. Justice Kennedy concluded that the ban on

distribution of fliers in the public forum of an airport terminal violated the First Amendment, particularly because any issue of congestion could be addressed by time and place regulations. *Id.,* —— U.S. at ——, 112 S.Ct. at 2720.

Justice Souter, joined by Justice Blackmun and Justice Stevens, explicitly adopted Justice Kennedy's approach to the forum-definition question. *Id.,* —— U.S. at ——, 112 S.Ct. at 2724. Justice Souter agreed with both Justices Kennedy and O'Connor that the distribution of fliers was "compatible" with the use to which the terminal had actually been put (Kennedy) and was not "incompatible with the multipurpose environment" of the airports (O'Connor). *Id.,* —— U.S. at —— – ——, 112 S.Ct. at 2724–25. Accordingly, Justice Souter concluded that the regulation of leafleting could not survive the searching level of judicial scrutiny appropriate for public forums. *Id.*

Chief Justice Rehnquist, joined by Justice White, Justice Scalia and Justice Thomas, dissented. *Id.,* —— U.S. at ——, 112 S.Ct. at 2710. Having previously concluded that the airport terminal was not a public forum and thus the ban warranted less exacting judicial scrutiny, these Justices concluded that the ban on leafleting was reasonable. *Id.,* —— U.S. at ——, 112 S.Ct. at 2710.

### b. Summary of *Lee* Principles

From the foregoing discussion of *Lee I* and *Lee II,* the following principles [10] can fairly be distilled:

1. All of the Justices who heard *Lee I* and *Lee II* (including seven who are presently active Justices) agree that there are essentially two levels of judicial scrutiny that attach to efforts by the government to regulate expressive activity in public buildings. —— U.S. at —— – ——, 112 S.Ct. at 2705–06, —— U.S. at —— – ——, ——, 112 S.Ct. at 2711–12, 2715. One level of scrutiny is strict and the other level of scrutiny is deferential. The strict level of scrutiny is expressed this way: If the public building is

**10.** So far as I can determine, the subsequent precedents of the Supreme Court have not changed these principles.

a public forum (whether "traditional" or "designated"), the government's attempts to regulate expressive activity "survive only if they are narrowly drawn to achieve a compelling state interest." *Lee I,* —— U.S. at ——, 112 S.Ct. at 2705. The deferential level of scrutiny is expressed as follows: If the public building is not a public forum, the government's attempt to regulate expressive activity "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.,* —— U.S. at —— ——, 112 S.Ct. at 2705–06, —— U.S. at —— ——, 112 S.Ct. at at 2711–12. In assessing the reasonableness of the regulation where a building is not a public forum and the attendant judicial scrutiny is deferential, Justice O'Connor paid particularly close attention to whether the forum involved a discrete, single-purpose facility or whether the forum involved multiple purposes. *Id.,* —— U.S. at —— —— ——, 112 S.Ct. at 2711–12.

2. Five of the Justices who heard *Lee I* and *Lee II* (including four who are presently active Justices) would define a public forum (whether "traditional" or "designated") based upon (a) whether the building *historically* had been considered a public forum for expressive activity, and (b) whether the operators had *intentionally* opened the building for speech activity. *Id.,* —— U.S. at —— ——, 112 S.Ct. at 2706–07; —— U.S. at —— —— ——, 112 S.Ct. at 2711–12.

3. Four of the Justices who heard *Lee I* and *Lee II* (including three who are presently active Justices) would define a public forum (whether "traditional" or "designated") based upon (a) a *comparison* of the subject property with traditional public forums; (b) a determination of whether the government has *permitted or acquiesced in broad public access* to the forum; and (c) a determination of whether expressive activity is *compatible* with the uses to which the government has as a factual matter dedicated the property. *Id.,* —— U.S. at ——, —— —— ——, 112 S.Ct. at 2718, 2724–25.

## 2. Application of *Lee* Principles to Facts

I shall next apply the foregoing principles to the facts of this case.

### a. Forum Definition

I find and conclude that the waiting/reception area of the local NDSS office is not a "traditional" or "designated" public forum. In arriving at this conclusion, I have applied both Chief Justice Rehnquist's methodology and Justice Kennedy's formulation. Applying either test, the result is the same.

### (i) Chief Justice's Test

■ Turning to the first component of Chief Justice Rehnquist's forum-definition test, the waiting/reception areas of offices that dispense welfare benefits have not *historically* been considered traditional public forums open to the public for expressive activity. Plaintiffs do not contend otherwise. Indeed, the cases relied upon by Plaintiffs concede this point. *New York City Unemployed & Welfare Council v. Brezenoff,* 677 F.2d at 238 (stating that the waiting areas of welfare centers are "not characterizable as traditional public forums" and citing *Albany Welfare Rights Org. v. Wyman,* 493 F.2d at 1323, in support of that assertion).

Addressing the second component of Chief Justice Rehnquist's forum-definition test, there is no evidence in this case that the waiting/reception area has been *intentionally* opened for expressive activity. On the contrary, Wusk's policy was to resist opening the waiting/reception area "up for the world." (Tr. 120:21–22.) In fact, the policy was to "minimize the numbers of groups" allowed access "as much as possible." (Tr. 150:15–151:3.)

Aside from NDSS employees and the welfare recipients themselves, only four outside groups have been allowed to enter the waiting/reception area to engage in expressive activity. Just like NDSS, these four groups provided basic social services to welfare recipients—assistance with tax preparation, nutrition, preschool education for children, and adult basic education.

As the Supreme Court has stressed, "when government property is not dedicated to open communication the government may—without further justification—*restrict use to those who participate in the forum's official business.*" *Perry,* 460 U.S. at 53, 103 S.Ct. at 959 (emphasis added). In this case, the

providers of information on nutrition and the like were participating with the agreement of welfare officials in the welfare office's official business—the provision of basic social services to welfare recipients. Accordingly, the use of the property by groups such as the county extension agency providing nutritional information does not transform the property into a public forum, whether "traditional" or "designated." *Id.*

To the extent that Plaintiffs try to equate (for purposes of forum definition) their expressive activity, which is explicitly intended to urge adoption of public policy positions ("Stop the War on Poor Children"), with expressive activity intended to provide information on meal preparation and the like, I reject the comparison as factually unfounded. For example, Stippel testified that when she engaged in the proposed expressive activity on the sidewalk in front of the building where NDSS was situated, she encountered "problems" when "we gave the information to somebody that didn't agree with our side," which in turn caused "heavy discussions." (Tr. 89:6–12.) It is inconceivable that the provision of information about recipes, how to fill out tax form 1040–EZ, or how to register for a prekindergarten or GED program would cause a "problem" involving a "heavy discussion."

This is true because one type of speech is intended to persuade on issues of public policy, while the other is intended to convey factual information on basic human needs totally unrelated to public policy. The fact that the state provides, and allows others to provide, factual information on basic human needs does not mean the state has converted the welfare office into a public forum, "designated" or otherwise, for the discussion of public-policy issues. The two kinds of "expressive activity" are simply different. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 806–11, 105 S.Ct. 3439, 3451–54, 87 L.Ed.2d 567 (1985) (the

participation limitation in the Combined Federal Campaign, a charity drive involving federal employees, to charitable agencies that provided direct health and welfare services, while excluding political advocacy organizations, was reasonable).[11]

A concrete example drawn from the facts of this case will illustrate the distinction between the two types of expressive activity. It is one thing for a state-run office to provide food stamps to a person on disability because of a mental impairment, while in the process allowing the county extension service to provide that person with information about how to prepare a nutritious meal. It is quite another thing for the state-run office to allow third persons explicitly associated with a branch of one of the major political parties (as is the case here) to lobby the mentally impaired person to attend a political rally while he or she is obtaining food stamps at the state-run office.

In sum, so long as the forum—in this case the welfare office—is not otherwise a public forum, "the State may reserve the forum for its intended purposes, *communicative or otherwise....*" *Perry*, 460 U.S. at 46, 103 S.Ct. at 955 (emphasis added). Indeed, "the mere fact that an instrumentality is used for the communication of ideas does not make a public forum...." *Id.* at 49 n. 9, 103 S.Ct. at 957 n. 9. This is so because:

> [i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.

*Id.* at 49, 103 S.Ct. at 957 (emphasis added). *See also Greer v. Spock*, 424 U.S. 828, 838 n. 10, 96 S.Ct. 1211, 1217 n. 10, 47 L.Ed.2d 505 (1976) (the fact that other civilian speakers

---

11. In this same vein, unlike the central office of NDSS where one might assume that public-policy issues are debated, the local office of NDSS is intended as a customer service center where welfare recipients apply for, and receive, welfare benefits, including information on basic human needs. As Wusk stated, "Our agency is not only

involved in maintenance ... like food stamps and ADC and Medicaid, but we also are a complete service office that has child welfare and adult protective services and the whole menagerie, if you will, of Social Service programs...." (Tr. 132:13–23.)

and entertainers had sometimes been invited to appear at Fort Dix did not convert the base into a public forum); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (a city transit system's rental of space in its vehicle for commercial advertising did not require it to accept partisan political advertising or create a public forum).

■ However, even if these four groups were not "participat[ing] in the forum's official business," extremely limited access to the forum by outside groups (as is the case here) would not transform an otherwise nonpublic forum into a public forum. *Perry,* 460 U.S. at 53, 103 S.Ct. at 959. For example, the Court explicitly held in *Perry* that "selective access does not transform government property into a public forum." *Id.* at 47, 103 S.Ct. at 956. The Court ruled that a school did not make its mail system a limited public forum by allowing the YMCA, Cub Scouts, and other civic groups to use the system because there was no evidence that the school had opened its mail system to "indiscriminate use by the general public." *Id.* Since use of the governmental property at issue here by outside groups is extremely limited, and certainly not indiscriminate, the fact that four groups have been allowed access to the forum does not convert it into a public forum (whether traditional or designated).

### (ii) Justice Kennedy's Test

■ I now turn to the first component of Justice Kennedy's forum-definition test: a *comparison* of the subject property with traditional public forums. As noted earlier, welfare waiting rooms have not historically been considered a public forum. Moreover, an *objective comparison of the physical attributes and primary uses* of the welfare waiting/reception room in the private building in this case with "traditional" public forums yields no similarities. *See, e.g., Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2500–01, 101 L.Ed.2d 420 (1988) (a residential street is a public forum); *Hague v. Com-*

*mittee for Indus. Org.,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (streets and parks are public forums).

Moreover, an objective comparison of the physical attributes and primary uses of the welfare waiting/reception area in this case with "designated" or "limited" public forums in other cases also establishes few, if any, similarities. *See, e.g., Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting facilities generally open for student meetings); *City of Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meeting generally open to the public for school board business); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theater generally open to the public for dramatic productions).

I shall next examine the second prong of Justice Kennedy's forum-definition test: a determination of whether the government has *permitted or acquiesced in broad public access* to the forum. As noted earlier, save for limited access by four groups providing factual information on basic needs consistent with the purposes of the welfare office, Wusk has always limited access to the forum. Moreover, there is no evidence that the public uses the waiting/reception area for any purpose other than obtaining social services. Indeed, while there is obviously no physical impediment to the public entering the office,[12] the presence of a uniformed security guard in the waiting room suggests that the public would not be permitted "broad access" to the waiting/reception area for purposes unrelated to receiving social services.

I shall next consider the third prong of Justice Kennedy's forum-definition test: a determination of whether the proposed expressive activity is *compatible* with the uses to which the government has as a factual matter dedicated the property.

In this case, the waiting/reception area is filled with some of the most underprivileged in our society seeking benefits from the state

---

12. "Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983).

for the most basic necessities of life. As one judge eloquently put it, these waiting/reception areas are "not public or limited public forums but are, indeed, but holding stations for the most pitiful captive audiences in our country." *New York City Unemployed & Welfare Council v. Brezenoff,* 677 F.2d at 244 (Murphy, J., concurring in part and dissenting in part).

These individuals—some of whom need protective services because of mental impairments, and all of whom need state assistance for some or all of the necessities of life—are peculiarly susceptible to coercion, whether subtle or overt, regarding, among other things, public-policy issues. This is true both because of the welfare recipients' unfortunate stations in life and because of the captive nature of their attendance at the welfare office. Still further, if expressive activity like that proposed by Plaintiffs is appropriately part and parcel of the forum's activities, the potential for abuse by welfare officials themselves—covertly tying the granting of welfare benefits to adherence to a certain political idealogy, for example—is very real. This is particularly true given the fact that welfare recipients may be registered to vote in the subject office. (Tr. 149:23–150:5.) Moreover, the risk that welfare recipients and others will perceive an appearance of political favoritism on the part of welfare officials if the waiting/reception area is the site for expressive activity like that proposed by Plaintiffs is also quite real.

Therefore, just as "[n]o First Amendment forum" was found to exist on a public-transit bus when political advertising was prohibited "in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience," *Lehman,*

418 U.S. at 304, 94 S.Ct. at 2718, I am equally persuaded that no First Amendment forum for Plaintiffs' proposed expressive activity is likely to "compatibly" exist with the uses to which the government has as a factual matter dedicated the subject welfare waiting/reception area.

### (iii) Summary

In summary, applying the forum-definition criteria of both Chief Justice Rehnquist and Justice Kennedy, the welfare waiting/reception area at issue here is neither a traditional nor a designated public forum.[13]

### b. Deferential Scrutiny of Regulation

Having found that the waiting/reception area is not a public forum of any kind, I must next determine whether Defendants' prohibition of the expressive activity proposed by Plaintiffs is reasonable, and, in this connection, I must also determine whether the regulation is an effort to suppress the speakers' activity due to a disagreement with the speakers' views. *Lee I,* —— U.S. at —— – ——, 112 S.Ct. at 2705–06. I turn to those issues next.

### (i) Reasonableness

 I begin with the understanding that the Supreme Court has said on numerous occasions that "the restriction 'need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation.'" *Lee I,* —— U.S. at ——, 112 S.Ct. at 2708 (emphasis in original) (quoting *United States v. Kokinda,* 497 U.S. 720, 730, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571 (1990)) (in turn quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 808, 105 S.Ct. 3439, 3452, 87 L.Ed.2d 567 (1985)). Thus, the standard of review regarding the

---

**13.** I pause to note briefly why I have not followed *Albany Welfare Rights Org. v. Wyman,* 493 F.2d 1319 (2d Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (blanket denial to welfare organization to hand out leaflets at welfare office violated First Amendment), and *New York City Unemployed & Welfare Council v. Brezenoff,* 677 F.2d 232 (2d Cir.1982) (although leafleting was protected by the First Amendment, regulations instituted at welfare office were valid time, place, and manner restrictions). I have two primary reasons for not following these cases, at least insofar as they implicitly hold that

a welfare office waiting area is a public forum. First of all, these cases were decided prior to *Lee I* and *Lee II;* therefore, they are not accurate descriptions of the present state of Supreme Court forum-definition jurisprudence. In a related vein, as Judge Murphy pointed out in his dissent in *Brezenoff,* the "issue whether the waiting rooms are or are not public or limited forums was not decided" in *Albany,* and in reliance upon *Albany,* the *Brezenoff* court essentially assumed that welfare waiting rooms were public forums. *Brezenoff,* 677 F.2d at 244. Thus, neither case gave serious attention to the critical forum-definition question.

regulation of speech in a nonpublic forum is explicitly intended to be deferential to the judgment of the administrators of the nonpublic forum.

▆ I next observe that in a nonpublic forum the "reasonableness" of a regulation on expressive activity is measured by the uses to which the nonpublic forum has been devoted by the public body. This means that a speech regulation in a nonpublic forum is "reasonable" when it is "consistent with the [government's] legitimate interest in 'preserv[ing] the property ... for the use to which it is lawfully dedicated.'" *Lee II*, —— U.S. at ——, 112 S.Ct. at 2712 (O'Connor, J., coauthor of the per curiam opinion in *Lee II*) (quoting *Perry*, 460 U.S. at 50–51, 103 S.Ct. at 957–58) (in turn quoting *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981)).

▆ Keeping in mind that the standard of review is deferential and that "reasonableness" is judged against dedicated use, I find and conclude that the regulation in this case is reasonable.[14] It is entirely consistent with the government's legitimate interest in preserving the local NDSS office, especially the waiting/reception area, for the use to which the office is lawfully dedicated, that is, the regulation seeks to maintain the forum as

a place where social services responsive to basic human needs are dispensed, as opposed to a place for discussion and debate on public-policy issues.

In contrast, and as I noted earlier in applying Justice Kennedy's forum-definition test, the expressive activity proposed by Plaintiffs is incompatible with the lawfully dedicated use of the NDSS office. While I shall not reiterate those points, four additional but related observations on the issue of "incompatibility" are in order.

First, the fact that food stamps—which have many of the attributes of money—would be dispensed in the waiting/reception area to over 1900 households, (pt. I of this Op. ¶ 10), during the precise time Plaintiffs sought to engage in their expressive activity, (pt. I ¶ 14), poses especially significant problems. The specter of over 1900 welfare recipients, compelled to wait in line to receive food stamps, being "lobbied"[15] to adhere to some political point of view raises not only obvious "captive" audience concerns (especially for those recipients with mental disabilities), but also serious additional concerns regarding the possibility of improper solicitation of political contributions. In order to responsibly address those concerns, Defendants would obviously have to increase their efforts to "police" the forum, a not insubstantial bur-

14. Plaintiffs argue that Wusk's policy is unwritten and, in any event, ambiguous. Consequently, the policy affords Wusk too much discretion and is therefore invalid. There are three responses to this argument. First, Plaintiffs have cited no cases which require the government, as a proprietor of a nonpublic forum, to write regulations in order to be able to exclude individuals from a *nonpublic forum*. Compare *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (county's assembly and parade ordinance pertaining to *public property* delegated overly broad licensing discretion to governmental official). Second, there was little or no practical reason for Wusk (or the other defendants) to write a regulation since the regulation was clear and simple: the forum was generally closed except to welfare recipients. Third, to the extent that the policy contained an exception for outside groups, the exception was quite limited, and it too was clear and simple: only groups that provided a "direct benefit" associated with the "basic needs of our customers" were allowed access to the forum. Accord *Cornelius*, 473 U.S. at 806–811, 105 S.Ct. at 3451–54 (the participation limitation in the Combined

Federal Campaign, a charity drive involving federal employees, to charitable agencies that provided direct health and welfare services, while excluding political advocacy organizations, was reasonable). In any event, I find as fact and conclude as a matter of law that neither the unwritten nature of the policy nor the substance of the policy itself afforded Wusk or anyone else overly broad discretion in violation of the First Amendment.

15. It will not do for Plaintiffs to ignore the fact that not only did they request to hand out and post literature, they also *stipulated* that they intended to *"talk to welfare recipients, when the welfare recipients came to the office to pick up food stamps and to conduct other business."* (Pt. I of this Op. ¶ 14; Ex. 1 ¶ 11.) (*See also* Pt. I ¶ 21; Ex. 1 ¶ 18 (emphasis added).) Still further, even if Plaintiffs intended to sit at the table near the bulletin boards to engage in their "talk," it is obvious, given the close proximity of the table to the food-stamp-issuance counters, (Pt. I ¶ 9), that recipients standing in line to receive food stamps would have little or no ability to avoid Plaintiffs.

den and one that does not now presently exist.[16]

Second, while the proposed expressive activity involves more than just handing out fliers, even that activity, if viewed in isolation, is problematic. As Chief Justice Rehnquist has observed, "Leafletting presents risks of congestion similar to those posed by solicitation. It presents, in addition, some risks unique to leafletting." *Lee II*, —— U.S. at ——, 112 S.Ct. at 2710 (dissent).[17]

For example, at a minimum, Defendants would need to "monitor[ ] leafletting activity in order to ensure that it is *only* leafletting that occurs, and not also solicitation [of monies]." *Id.* (emphasis in original). That is one of the reasons why in a nonpublic forum "property owned or controlled by the government ... may be subject to prohibition of speech, leafleting, picketing, or other forms of communication without running afoul of the First Amendment." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981).

Third, with regard to Plaintiffs' request to post one of their fliers on the bulletin board, what little evidence there is on the subject establishes that Wusk's policy was reasonable. The fact is that space on the bulletin boards is quite limited as they are small. (Tr. 132:1–7.) Indeed, in the photos intro-

duced into evidence, the bulletin-board space appears almost entirely devoted to social-service notices. (Ex. 1, Prelim. Hr'g (photos).) Consequently, if they honored Plaintiffs' request, Defendants would undoubtedly be confronted with similar requests by other advocacy groups, resulting, as Justice Blackmun observed, in "lurking doubts about favoritism, and sticky administrative problems ... in parceling out limited space to eager politicians." *Lehman*, 418 U.S. at 304, 94 S.Ct. at 2718. *See also Lee II*, —— U.S. at ——, 112 S.Ct. at 2709 (noting that the disruptive impact of an exemption for one group cannot be judged in isolation, "[f]or if petitioner is given access, so too must other groups").

Fourth, even though the forum is "incompatible" with the proposed expressive activity, Plaintiffs are not without alternatives to express their point of view. They have used the sidewalk adjoining the building where the local NDSS office is situated to engage in their expressive activity. Aside from the problem about using a table (which Plaintiffs concede is not attributable to Defendants),[18] I find little or no persuasive evidence to suggest that this alternative would not provide the Plaintiffs with a viable, although less comfortable, solution.[19] This is particularly true since Plaintiffs targeted the first three days of the month as the period when they

---

**16.** The four organizations allowed by Wusk to enter the forum posed no similar threat because they were providing information on such things as tax preparation, recipes, preschool education, and adult basic education, the provision of which was entirely consistent with the dedicated purpose of the forum.

**17.** In this regard, it should be remembered that three other Justices joined Chief Justice Rehnquist in his dissent on the issue of leafleting. Moreover, in *Lee II*, Justice O'Connor agreed that the ban on leafleting was unreasonable, even though the airport terminal was *not a public forum*, because she believed the proprietors of the airport were "operating *a shopping mall* as well as an airport." *Id.*, —— U.S. at ——, 112 S.Ct. at 2713 (emphasis added). The Justice found no problems "intrinsic to the act of leafletting that would make it naturally incompatible with a *large, multipurpose forum such as those at issue here.*" *Id.*, —— U.S. at ——, 112 S.Ct. at 2714 (emphasis added). In this case, the welfare office, and the waiting/reception area in particu-

lar, obviously cannot fairly be characterized as either a "shopping mall" or a "large, multipurpose forum." Finally, the other Justices who found that the ban on leafleting violated the First Amendment did so because, in their opinion, the airport terminal was a "public forum," which, as indicated earlier, I have found not to be the case here.

**18.** Walker testified that they were allowed to use chairs but not tables. (Tr. 64:14–22.) In fact, she testified that this restriction only made "it a little bit harder." (Tr. 65:1.) Stippel testified that they were not allowed to use either tables or chairs. (Tr. 89:15–17.)

**19.** Although Stippel and Walker had physical problems that would not permit them to stand for long periods of time, the evidence reveals that without a table, but with the assistance of other "volunteers," FAIR and its members were able to complete the proposed expressive activity on the sidewalk. (Tr. 89:18–25.)

wanted to engage in the proposed expressive activity, thus requiring them to use the sidewalk as a "public forum" for a relatively short period of time.

### (ii) Viewpoint Discrimination

■ I next find and conclude that the "challenged regulation ... is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Lee I,* — U.S. at —–—, 112 S.Ct. at 2705–06. The evidence establishes without contradiction that Wusk enforced the regulation without regard to whether he agreed or disagreed with the message of the speaker. (Tr. 134:10–16.) In fact, the evidence establishes that Wusk enforced the regulation against a group he belonged to and supported. (Tr. 140:17–25.)

■ Plaintiffs argue that because the regulation focuses on "advocacy," the policy is not neutral and therefore violates the First Amendment. In support of this proposition, Plaintiffs rely heavily upon *Lamb's Chapel v. Center Moriches Union Sch. Dist.,* — U.S. —–, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). I am not persuaded by their argument.

■ First, *"[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." Perry,* 460 U.S. at 49, 103 S.Ct. at 957 (emphasis added). Indeed, "[t]hese distinctions may be impermissible in a public forum *but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." Id.* (emphasis added). Thus, given that the forum is nonpublic, its administrators are permitted to fairly distinguish one *type* of speech—such as political—from another in terms of defining who shall have access to the forum. *See, e.g., Lehman,* 418 U.S. 298, 94 S.Ct. 2714 (in a nonpublic forum—city buses—a city transit system's rental of space in its vehicles for commercial advertising did not require it to accept partisan political advertising).

Second, cases like *Lamb's Chapel,* — U.S. —–, 113 S.Ct. 2141, do not support Plaintiffs' assertion that the policy in this case violated the First Amendment because of viewpoint discrimination. In *Lamb's Chapel,* the Supreme Court unanimously held that a school could not prohibit a church's request to use school facilities to show a film on family values and child rearing because the film approached the subject from a religious point of view when the school also permitted other speakers to speak on family and child-rearing issues. *Id.,* — U.S. at —–—, 113 S.Ct. at 2146–48. The Court reasoned that since the school had allowed discussions on family values and child rearing, it could not discriminate against the church regarding those topics simply because the speaker choose a religious point of view from which to discuss the topics that others were permitted to address. *Id.* Nevertheless, the Court reiterated its view that " 'a speaker may be excluded from a non-public forum if he wishes to address a topic not encompassed within the purpose of the forum....' " *Id.,* — U.S. at —–, 113 S.Ct. at 2147 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985)).

In this case, Plaintiffs desired to speak on public-policy matters generally and public-policy matters concerning welfare specifically. Neither the purpose of the forum nor any of the four outside groups permitted to use it dealt with the topic of public-policy issues generally or public-policy issues concerning welfare specifically. Hence, unlike *Lamb's Chapel* and other cases, there was no improper viewpoint discrimination in this case when Plaintiffs were not permitted to use the forum to further their public-policy agenda since public policy was never a topic of the forum.[20]

### (iii) Summary

The regulation in this case is reasonable because it is consistent with the NDSS's legitimate interest in preserving the property for the use to which it is lawfully dedicated. *Lee II,* — U.S. at —–, 112 S.Ct. at 2712

---

**20.** However, in answer to a hypothetical question, Wusk observed that if FAIR desired to distribute nutritional information like the county extension service, his policy would allow FAIR to do so. (Tr. 151:8–22.)

(O'Connor, J., coauthor of the per curiam opinion in *Lee II* ) (quoting *Perry*, 460 U.S. at 50–51, 103 S.Ct. at 957–58) (in turn quoting *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981)). Moreover, the regulation does not constitute viewpoint discrimination because its focus is on types or topics of speech, not the content of the speech. *Perry*, 460 U.S. at 48–49, 103 S.Ct. at 957.

### C. Equal Protection

■ Plaintiffs argue that their right to equal protection of the laws was violated because four outside groups were allowed access to the forum, and they were not.

The law on this issue is set forth in *Perry*, 460 U.S. at 54–55, 103 S.Ct. at 960. Regarding the interplay between the Equal Protection Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment, the Court stated:

> When speakers and subjects are similarly situated, the State may not pick and choose. Conversely on government property that has not been made a public forum, not all speech is equally situated, and the State may draw distinctions which relate to the special purpose for which the property is used.

*Id.* at 55, 103 S.Ct. at 960.

After a finding that the forum in this case is a nonpublic forum and that there has been no viewpoint discrimination, it follows that there has also been no equal protection violation. I so find and conclude.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document, providing that "judgment is entered for Defendants and against Plaintiffs, and Plaintiffs shall take nothing."

### JUDGMENT

Pursuant to the court's Memorandum and Order previously filed in this matter, judg-ment is entered for Defendants and against Plaintiffs, and Plaintiffs shall take nothing.