No. 95-2891

Families Achieving Independence   *
and Respect, Sheryl Walker,      *
Vicki Stippel,                   *
                                  *
          Appellants,      *
                                  *   Appeal from the United States
       v.                *   District Court for the
                                  *   District of Nebraska.
Nebraska Department of Social   *
Services, Mary Dean Harvey,     *
Ann Hogan, Daryl Wusk, Suzy     *
Skinner,                   *
                                  *
          Appellees.      *

Submitted: February 12, 1996

Filed: July 31, 1996

Before MAGILL, HEANEY, and MURPHY, Circuit Judges.

HEANEY, Circuit Judge.

A grass-roots, welfare rights organization brought this action under 42 U.S.C. §§ 1983 and 1988 to gain access to the lobby of a state-operated, welfare office for the purpose of distributing written materials to and discussing welfare policy issues with welfare recipients. The district court held that the state's exclusion of the group did not violate the First or Fourteenth Amendment. We reverse. The policy employed to decide which persons are permitted access to the lobby is vague and subject to arbitrary enforcement. For this reason, the group's exclusion violates the First Amendment.

I.  BACKGROUND

The facts of this case are essentially undisputed.  After a consolidated bench trial and hearing on a request for preliminary injunction, the district court made detailed findings of fact pursuant to Federal Rule of Civil Procedure 52(a).  Families Achieving Independence & Respect v. Nebraska Dep't of Social Servs. ("FAIR"), 890 F. Supp 860 (D. Neb. 1995).  We summarize below only those facts relevant to our decision.

Families Achieving Independence and Respect (FAIR) is a loosely-organized group of past and current welfare recipients providing educational support for low-income persons.  Among its goals, FAIR seeks "to more fully inform the public discussion and debate on the 'welfare system' and 'welfare reform.'"  FAIR, 890 F. Supp. at 862 (quoting Pls.' Ex. 3, Funding Proposal at 1).[1]

---

[1]FAIR has no membership list per se and is not incorporated. The organization's two staff members, Sheryl Walker and Vicki Stippel, are the other named appellants in this case.  Each is a welfare recipient who, for her work on behalf of FAIR, receives "scholarships" in lieu of a salary.  FAIR, 890 F. Supp. at 863. FAIR finances its activities under a grant from a charitable organization.  The director of the Nebraska Center for Legal Services (a special project of the Legal Aid Society, Inc. of Omaha) oversees the grant and advises FAIR with respect to the conditions of the grant and long-term organizational strategy.  The primary limitation on the funds is that the money may not be used for political purposes.  As a result, FAIR does not engage in activities related to partisan politics or in the direct lobbying of elected officials.  (Tr. 42:4-17.)

Nonetheless, the dissent attempts to present FAIR as a highly political organization both registered as a lobbyist with the state and "allied . . . with various organizations, including the Nebraska Women's Political Network, the National Organization of Women, and the Nebraska Democratic Women . . . ."  Dissenting Op., infra at 2.  As found by the district court, FAIR was not a registered lobbyist when this case went to trial.  FAIR, 890 F. Supp. at 862.  FAIR briefly registered with the State of Nebraska as a lobbyist out of "an excess of caution," (Tr. 39:13-14), and soon withdrew its application for registration after determining, with the assistance of the staff of the Accountability and

The Nebraska Department of Social Services (NDSS) is a state agency that provides assistance to low-income individuals and families. NDSS maintains both a local office and a central office in Lincoln, Nebraska. Daryl Wusk is the administrator of the local NDSS office in Lincoln. The local NDSS office provides a broad range of services to welfare recipients. As Wusk explained, "Our agency is not only involved in [providing] maintenance . . . like food stamps and AFDC and Medicaid, but we also are a complete service office that has child welfare and adult protective services and the whole menagerie, if you will, of Social Services programs . . . ." Id. at 863 (quoting Tr. 132:13-23).

The local office of NDSS is located on the second floor of a commercial building owned and managed by a private company. The building management will not allow FAIR or any other group to distribute materials in the common areas of the building. Within the local NDSS office is a large, enclosed waiting and reception area (hereinafter "lobby"). The lobby is a high-traffic area of the local NDSS office. Id. It is especially busy during the first five days of the month when the agency issues food stamps to over 1,920 households "over the counter" in the reception area. Id. Throughout the month, the lobby is used by people waiting to receive food stamps as well as by clients waiting to meet with NDSS personnel in adjoining interview rooms.

NDSS has no agency policy for dealing with requests from outside groups to distribute information or otherwise engage in

---

Disclosure Commission, that FAIR was not a lobbyist (Tr. 39:19-40:22). Moreover, the extent of FAIR's affiliation with political organizations was its co-sponsorship of a rally at the state capital. The rally was also sponsored by various day care providers; those day care providers certainly were not transformed into political groups by their mere association with the rally. In any event, our decision turns on the policy used by the welfare office to distinguish between organizations appealing to use the facilities, not on the exact nature of FAIR's political leanings.

speech activity on NDSS property. Wusk has developed an unwritten policy to handle such requests at the local NDSS office. According to Wusk, he declines to open the lobby "up for the world"; rather, he tries "to 'minimize the numbers of groups' allowed access 'as much as possible.'" Id. at 865 (quoting Tr. 120:21-22, 150:15-151:3). Wusk explained that restrictions are necessary to prevent administrative difficulties, such as congestion, and to ensure that his clients are treated with dignity and not forced to encounter individuals promoting a particular political agenda. Id. at 866. Specifically, Wusk's policy consists of two parts: (1) only groups that provide a "direct benefit" associated with the "basic needs" of welfare recipients are allowed access to the lobby, and (2) "advocacy groups" are never allowed access regardless of the message or position advocated by the group. Id.

Over the years, Wusk has received numerous requests from groups seeking access to the lobby. Wusk has granted the requests of four groups: (1) volunteers who assisted welfare recipients in the preparation of state and federal income tax returns, (2) representatives of the Head Start Program who registered children of welfare recipients for the preschool program, (3) representatives of a food and nutrition program who distributed literature and recipes, and (4) persons who registered welfare recipients for GED and English-as-a-second-language courses at a local community college.[2] Wusk specifically turned down requests

_____

[2]Stippel testified that, in addition to the listed groups, she had seen Girl Scouts using the lobby of the local NDSS office in the past. (Tr. 80:23-81:7.) The district court, however, credited Wusk's testimony whereby he "specifically denied allowing the Girl Scouts access to the [lobby] to hand out materials." 890 F. Supp. at 866, n.4. Wusk's actual testimony illustrates not only his poor memory of this matter, but also some of the problems inherent in enforcing a policy like Wusk's:

> A. [Wusk:] We have probably had Girl Scouts on the premises, but I don't believe that they--that I recall ever set up a table to sign up and do those kinds of things. We have groups come in once in a while and bring

us or come in to see the office and do little mini tours and things, but they may have come that way, but I don't remember that

-4-

for access to the lobby by groups and institutions including a Wesleyan University social work class, the Lincoln School of Commerce, "Mad Dads" (a church-affiliated group designed to provide children with constructive activities), "Journey" (a Native American health rights organization), a "Right-To-Life" group, and various University of Nebraska research groups. Id.

To determine whether an entity making a request to use the lobby is an advocacy group--and thus excludable--Wusk explained that either a group would self-identify as an advocacy group or he would review the group's literature to make a subjective determination about the nature of the group's work. (Tr. 137:1-144:6.) Despite her best efforts, counsel for FAIR could not pin Wusk down on clear definitions of either "advocacy group" or a welfare recipient's "basic needs." With respect to the former, Wusk testified that an advocacy group is one that "promotes an issue." (Tr. 137:21-24.) As to welfare clients' basic needs, Wusk

---

they came in and did a table.

> Q. Is it possible that somebody could have set up [a table] in the office area at sometime without your knowledge?
>
> A. That is possible.
>
> Q. Had you known that the Girl Scouts wanted to come on the premises and access clients for the purpose of soliciting membership, would you have allowed that to happen?
>
> A. No.

(Tr. 124:16-125:4.)

Although the district court might have been more accurate had it characterized Wusk as having denied that he remembered giving the group access, we do not disturb the court's factual finding that the Girl Scouts were never permitted to distribute materials or solicit membership in the lobby.

explained that food, clothing, and shelter certainly qualify; in the same sentence, however, he asserted that even the Lincoln Children's Museum "addresses a psychological need" consistent with his agency's commitment to "deal with child welfare and trying to promote some healthy families." (Tr. 141:9-17.)  Wusk also stated that he would not permit the Red Cross to use the lobby to distribute information on CPR because his "customers can live long and healthy [lives] without CPR training."  (Tr. 135:22-136:14.)

In January 1995, Stippel telephoned Suzy Skinner, Wusk's assistant, and requested permission to have one or two FAIR members sit at a table in the lobby during the first three days of February.  FAIR representatives wanted to talk to welfare recipients and distribute materials.  The written materials included:  (1) a brochure that explains what FAIR is, the group's goals, and the policy issues FAIR seeks to address; (2) a flier announcing an upcoming Valentine's Day rally at the state capitol to "Stop the War on Poor Children" co-sponsored by FAIR; and (3) a postcard designed for welfare recipients to send to their elected representatives in the names of their children urging support for measures to assist families in getting off welfare.  After reviewing the materials, Skinner indicated that she did not think that there would be any problem but that she would have to discuss the matter with Wusk.  890 F. Supp. at 864-65.  Wusk then reviewed the materials and denied FAIR's request to use the lobby.  Wusk stated that FAIR did not provide a direct benefit to NDSS clients.  Id. at 865.

On February 1, 1995, despite Wusk's decision, representatives from FAIR came to the lobby to talk to welfare recipients and to distribute information.  Skinner again informed the group that it was not permitted to use the lobby.  During this conversation, Skinner asked whether FAIR's announcement about the upcoming rally could be placed on the bulletin board in the lobby.  Id.  Wusk, through Skinner, subsequently informed FAIR it would not be allowed

to display the announcement on the bulletin board because it did not provide a direct benefit to welfare recipients.  Id.  After being informed that they would not be allowed to remain in the lobby, all members of the group left voluntarily without causing a disturbance.

FAIR brought this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988 alleging that the defendants violated their First Amendment rights to free speech and free association and their Fourteenth Amendment right to equal protection by denying them access to the lobby where other groups had been allowed to engage in similar activity.  After a hearing, the district court decided in favor of the defendants.  The court held that the lobby was not a public forum.  Thus, FAIR's expressive activity could be prohibited in the lobby without violating the First Amendment as long as the regulation was reasonable and not an effort to suppress expression because of opposition to the speaker's views.  The court concluded that the NDSS prohibition was reasonable because it sought to maintain the lobby as a place where social services are dispensed as opposed to a place for discussion and debate on public policy issues.  FAIR appeals.  We reverse.

## II.  DISCUSSION

Appellants do not challenge the district court's findings of fact. Rather, FAIR challenges the district court's legal conclusion that FAIR's exclusion from the welfare office lobby was constitutional.  Although we review the district court's factual findings only for clear error, Fed. R. Civ. P. 52(a), where the constitutional issues present mixed questions of law and fact, our review is de novo.  Gerritsen v. City of Los Angeles, 994 F.2d 570, 574 (9th Cir.) (noting that review of First Amendment questions is de novo because they present mixed questions of law and fact requiring the appellate court to apply principles of First

Amendment jurisprudence to the specific facts of the case), cert. denied, 510 U.S. 915 (1993).

In holding that NDSS's exclusion of FAIR from the welfare office lobby was constitutional, the district court relied heavily on its determination that the welfare office lobby was not a public forum. FAIR, 890 F. Supp at 871. Having made that determination, the court disposed of the remaining questions--whether the prohibition was reasonable and not an effort to suppress the speakers' activity due to disagreement with their views--in relatively short order. In this case, however, the constitutionality of FAIR's exclusion from the welfare office turns not on the labeling of the forum, but on an analysis of the policy. We hold that the policy on its face violates the First Amendment under even the least-exacting reasonableness standard applicable to nonpublic forums. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983) (delineating three categories of public property and each category's corresponding standard of review). The welfare office policy is unreasonable because it permits state officials to apply impermissibly vague criteria to distinguish between persons or groups seeking to engage in expressive activity in the lobby. See NAACP Legal Defense & Educ. Fund,, 504 F. Supp. 1365, 1367 (D. D.C. 1981) (holding that a requirement that a charity provide "direct services" is too vague a basis on which to distinguish between groups for participation in a federally-sponsored, fund-raising campaign). Therefore, we reverse the district court without engaging in an exhaustive forum analysis and leave the question of whether the welfare office lobby is a public forum for another day. See Airport Comm'rs v. Jews For Jesus, 482 U.S. 569, 573-74 (1987) (holding it unnecessary to reach public forum question where regulation prohibiting all First Amendment activities in airport was facially unconstitutional under overbreadth doctrine); Lebron v. National R.R. Passenger Corp. (AMTRAK), 74 F.3d 371, 372 (2d Cir. 1996) (C.J. Newman, dissenting) ("[N]o matter what the scope of the forum, a governmental entity

violates the First Amendment when it bars display of political messages pursuant to a 'policy' that [is] vague, unwritten, unclear to those who must administer it, and inconsistently applied."), denying reh'g and amending, Lebron v. AMTRAK, 69 F.3d 650 (2d Cir. 1995).

The essential, interrelated terms of the policy--"direct benefit," "basic needs," and "advocacy group"--are neither self-defining nor defined by the policy. On the contrary, the terms are elastic. As demonstrated by Wusk's own testimony, it is difficult to define the terms and nearly impossible to apply them consistently. We disagree with the dissent's contention that Wusk's policy has been consistently interpreted and applied, Dissenting Op., infra at 7. For example, we see no basis for a bright-line distinction between Head Start--a group that provides preschool education and socialization opportunities for poor children--and FAIR--a group that educates welfare recipients and gives them the tools to understand and participate in the legislative process as it pertains to welfare reform. Both provide a benefit to welfare recipients, and both are motivated by a desire to improve the basic living conditions of the least privileged in our society. Moreover, both are arguably advocacy groups in that both "promote issues." We discuss application of the policy to other groups not to imply that Wusk committed any particular error, but instead to highlight that the policy necessarily requires arbitrary line drawing and yields inconsistent results.

If a governmental policy restricts protected expressive conduct, it will withstand constitutional scrutiny only if it is clear and consistently applied. NAACP Legal Defense & Educ. Fund v. Campbell, 504 F. Supp. at 1367. Two particular policies underlie this vagueness doctrine: (1) the need for notice informing those subject to a policy of its meaning, and (2) providing officials with explicit guidelines to avoid arbitrary and discriminatory enforcement. Id. The state policy fails on both

counts.  The policy fails to give adequate notice and confers a virtually unrestrained power on authorities to decide whether a group provides a benefit to welfare recipients.  Cf. Airport Comm'rs v. Jews For Jesus, 482 U.S. at 576 ("The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.") (citations omitted).

The dangers of a vague standard are all the more heightened where, as here, a group seeks to engage in core expressive conduct protected by the First Amendment.  The Supreme Court recently observed that "handing out leaflets in the advocacy of a politically controversial viewpoint [] is the essence of First Amendment expression."  McIntyre v. Ohio Elections Comm'n, ___ U.S. ___, 115 S. Ct. 1511, 1519 (1995); see also Albany Welfare Rights Org. v. Wyman, 493 F.2d 1319 (2nd Cir.), cert. denied, 419 U.S. 838 (1974) (holding that a blanket denial to welfare rights organization requesting to hand out leaflets at welfare office violated First Amendment).  FAIR is a grass-roots organization designed to empower welfare recipients and facilitate their involvement in welfare reform.  To that end, FAIR wants to provide information to welfare recipients about the current welfare-reform debate and about the possible impacts of proposed legislative changes.  It is well established that:

> [d]iscussion of public issues . . . [is] integral to the operation of the system of government established by our Constitution.  The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  Roth v. United States, 354 U.S. 476, 484 (1957).  Although the First Amendment protections are not confined to "the exposition of ideas," Winters v. New York, 333 U.S. 507, 510 (1948), "there is practically universal agreement that a major purpose of the Amendment was to protect the free discussion to governmental affairs . . . ."  Mills v. Alabama, 384 U.S. 214, 218 (1966).  This no more than reflects our "profound national commitment  to the principle that debate on

> public issues should be uninhibited, robust, and wide-open." <u>New York Times v. Sullivan</u>, 376 U.S. 254 (1964).

<u>McIntyre</u>, 115 S. Ct. at 1518-19. The vagueness of the state's policy is particularly problematic in view of the fact that the policy was used to prevent FAIR from engaging in core speech.

By rejecting the approach used by the local NDSS office to control access to its lobby, we do not preclude all restrictions on the use of its welfare office lobby. The government need not permit all forms of speech on property that it owns or controls. Certainly the agency has a right, as well as a duty, to protect its clients from fraud, harassment, and undue annoyance. Safety and over-crowding also present legitimate administrative concerns. Although the policy under consideration may be well-intended, its standards are vague and it creates a substantial potential for arbitrary and discriminatory application. It follows that the policy cannot withstand First Amendment scrutiny. Therefore, we reverse the decision of the district court.

MAGILL, Circuit Judge, dissenting.

I respectfully dissent. Because I conclude that the Nebraska Department of Social Services' Lancaster County local office's (NDSS) policy on expressive activities by outside groups is not unconstitutionally vague, and that the district court correctly determined that (1) the NDSS office is not a public forum; (2) the NDSS's regulation of expressive conduct in the office is reasonable; and (3) the NDSS prohibition on Families Achieving Independence and Respect's (FAIR) efforts to advocate their position to a captive audience was not motivated by opposition to their viewpoint, I would affirm the district court.

I.

During the first five days of each month, the NDSS office in Lincoln, Nebraska, is "especially busy because food stamps are issued to 1,920 households 'over the counter.'" FAIR v. Nebraska Dep't of Social Servs., 890 F. Supp. 860, 864 (D. Neb. 1995). To limit congestion in such a high-traffic area and to "'treat [welfare recipients] with dignity' and not force NDSS customers to encounter individuals promoting a particular political point of view in order to obtain the necessities of life," id. at 866 (quoting Trial Tr. at 119-20), Daryl Wusk, the administrator of the NDSS office, created a "general policy of keeping the waiting/reception area [of the NDSS office] closed." Id. at 865. This policy provided that

> (a) "advocacy groups," regardless of whether Wusk agreed or disagreed with the group's message, were never allowed access to the waiting/reception area for advocacy purposes; and (b) only groups that provided a "direct benefit" associated with the "basic needs of our customers" were allowed access to the waiting/reception area.

Id. at 865-66 (citations to record omitted; note omitted). A similar policy applied to the bulletin boards located in the office. See id. at 866-67.

The district court found that, "[o]ver the years, only four groups had been allowed access to the waiting/reception area in order to hand out materials to welfare recipients." Id. at 866. These groups provided nutrition information, registration in GED and ESL adult education courses, registration in Head Start prekindergarten classes, and volunteer assistance with state and federal tax forms.[3] By contrast, other groups, such as social work

---

[3]The bulletin boards contained information regarding nutrition, health, housing, Head Start registration, volunteer tax assistance, a "parent's center" at the YWCA, employment and employment training opportunities, free stoves from a rent-to-own company, free admissions or family memberships to the Lincoln Children's Museum, and enrollment in "Tele-Care," a service offered by the Lincoln General Hospital to ensure participants' well-being on a daily basis. See Def. Ex. 1.

classes, right-to-life groups, and "Mad Dads" (a group which Wusk belonged to and otherwise supported) were consistently denied access to the office.

In January 1995, FAIR sought access to the office to advertise an upcoming rally at the Nebraska state capitol. FAIR, which had been a registered lobbyist in the State of Nebraska and had allied itself with various organizations, including the Nebraska Women's Political Network, the National Organization of Women, and the Nebraska Democratic Women, was sponsoring the rally to "show strong, unified, grassroots opposition to the destruction of our nation's social safety net." Pl. Ex. 5. FAIR was denied access to the NDSS office's lobby and bulletin boards because it was an advocacy group which did not offer a direct benefit associated with a basic need of welfare recipients.

FAIR brought an initial action in the district court for temporary injunctive relief, which was denied, and the instant action, seeking damages and permanent injunctive relief. Following a hearing, the district court denied relief. In its thoughtful and well-written memorandum opinion, the district court determined that, under several competing Supreme Court tests, the NDSS office was not a public forum. See FAIR, 890 F. Supp. at 871. Because of this crucial determination, the policy limiting expressive conduct in the office could be upheld if it was "reasonable," see id. at 874, and if the policy was not an effort to discriminate on the basis of the speaker's viewpoint, see id. at 877. The district court, finding that "neither the unwritten nature of the policy nor the substance of the policy itself afforded Wusk or anyone else overly broad discretion in violation of the First Amendment," id.

at 875 n.14, held that neither the plaintiffs' First Amendment nor equal protection rights had been violated.  <u>Id.</u> at 877-78.

## II.

In this case, the district court served as the finder of fact, and this Court reviews these findings only for clear error.  <u>See</u> Fed. R. Civ. P. 52(a).  Throughout its opinion, however, the majority second-guesses the facts found by the district court, and attempts to draw its own factual conclusions from the record in this case without initially finding clear error.  For example, in describing Head Start, one of the organizations allowed to use the NDSS office, the Majority declares:

> we see no basis for a bright-line distinction between Head Start--a group that provides preschool education and socialization opportunities for poor children--and FAIR-- a group that educates welfare recipients and gives them the tools to understand and participate in the legislative process as it pertains to welfare reform. Both provide a benefit to welfare recipients, and both are motivated by a desire to improve the basic living conditions of the least privileged in our society. Moreover, both are arguably advocacy groups in that both "promote issues."

Maj. Op. at 9.  I am frankly confused by the majority's inability to distinguish between a political advocacy organization and a preschool class: the first attempts to secure political goals by campaigning and outreach efforts, while the other teaches infants their ABCs.  The majority assumes that FAIR provides a benefit to welfare recipients, but the district court did not make this finding of fact.  Beyond a witness's assertion at trial that FAIR's efforts were "educational," <u>see</u> Trial Tr. at 60 (Testimony of Walker) ("[i]f we did not notify them [welfare recipients] of the rally, they may not know about it"), I can find nothing in the record to support such a conclusion.  The majority assigns similar motivations to Head Start and FAIR, yet this description of Head

-14-

Start's goals is found nowhere in the record; I must assume that the majority is taking judicial notice (from what source, I am uncertain) of facts which were not in evidence at the trial. The district court, in considering FAIR's comparison of itself and groups allowed access to the NDSS office, found such a comparison "factually unfounded," FAIR, 890 F. Supp. at 872. The majority ignores this finding and "arguably" concludes that Head Start is, like FAIR, an advocacy group. There is not a scintilla of evidence in the record to support this conclusion, however, and I accordingly reject it.

In addition, the majority states that Wusk's analysis of whether an organization was an advocacy group was a "subjective determination." Maj. Op. at 5. Whether Wusk based his decisions on subjective or objective criteria is a question of fact, and the finding made by the majority was not made by the district court. In addition to usurping the fact-finding function of the district court, the majority makes this assertion without evidentiary support. Wusk testified that his determination was usually based on a group's self-identification as an advocacy group, see Trial Tr. at 137, which is clearly an objective criteria. When Wusk attempted to provide an objective definition of "advocacy," FAIR's attorney interrupted him, and stated, "I don't care about other people. I want to know how you define advocacy group." Id.

**III.**

The majority, declining to address whether the lobby of the NDSS office is, or is not, a public forum, declares the office's unwritten policy to be vague, and therefore facially unconstitutional, because the "essential, interrelated terms of the policy--'direct benefit,' 'basic needs,' and 'advocacy group'--are

-15-

neither self-defining nor defined by the policy." Maj. Op. at 9. See also id. (describing these terms as "elastic"). I disagree.[4]

While the NDSS office's policy is unwritten, "[t]he fact that a policy is not committed to writing does not of itself constitute a First Amendment violation," Lebron v. National R.R. Passenger Corp. (AMTRAK), 69 F.3d 650, 658 (2d Cir. 1995), opinion amended on denial of reh'g, Lebron II, 74 F.3d at 371, so long as the policy is made explicit by "'well-established practice.'" Id. (quoting City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 770 (1988)). As noted by the district court,

> there was little or no practical reason for Wusk (or the other defendants) to write a regulation since the regulation was clear and simple: the forum was generally closed except to welfare recipients. . . . [T]o the extent that the policy contained an exception for outside groups, the exception was quite limited, and it too was clear and simple: only groups that provided a "direct benefit" associated with the "basic needs of our customers" were allowed access to the forum.

---

[4]In concluding that the policy in this case is vague, the majority relied on the dissenting opinion in Lebron v. National R.R. Passenger Corp. (AMTRAK), 74 F.3d 371, 372-73 (2d Cir. 1995) (Lebron II) (Newman, C.J., dissenting), cert. denied, 116 S. Ct. 1675 (1996), which argued that:

> no matter what the scope of the forum, a governmental entity violates the First Amendment when it bars display of political messages pursuant to a 'policy' that has been found by a fact-finder, with abundant evidentiary support, to be vague, unwritten, undisseminated, unclear to those who must administer it, and inconsistently applied.

(emphasis added). I note that, in this case, no finder of facts has made these findings, with the sole exception that the policy was unwritten. Indeed, the district court rejected FAIR's argument that the policy was ambiguous, see FAIR, 890 F. Supp. at 875 n.14, and found instead that the policy "was clear and simple." Id. See also id. at 866 (describing only consistent applications of the policy).

-16-

FAIR, 890 F. Supp. at 875 n.14.

We have held that, "[t]o survive a vagueness challenge, a statute [or policy] must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply the statute." United States v. Dinwiddie, 76 F.3d 913, 924 (8th Cir. 1996) (quoting Video Software Dealers Ass'n v. Webster, 968 F.2d 684, 689 (8th Cir. 1992)).  In examining the terms of a rule for vagueness, the Supreme Court has noted that

> there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions [here] may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

CSC v. Letter Carriers, 413 U.S. 548, 578-79 (1973) (upholding restrictions on federal employees' political activities).  See also Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 473-74 (8th Cir. 1991) (rejecting argument that ordinance was impermissibly vague for failing to define "church," "private club," and "economic activity"); cf. Tindle v. Caudell, 56 F.3d 966, 973 (8th Cir. 1995) ("the ability to conceive of hypothetical problematic applications does not render the rules susceptible to an over-breadth challenge") (noting that rules which did "not precisely define what would constitute impermissible conduct" were nevertheless not vague because "they give adequate notice that high standards of conduct are required").

Under these principles of common sense interpretation and well-established practice, the NDSS office's policy meets the standard set forth in Dinwiddie.  The definition of an "advocacy group" provided by Wusk, a group which "promotes an issue," Trial

-17-

Tr. at 137 (Testimony of Wusk), states the common sense, lay understanding of the term. See, e.g., Webster's II New Riverside University Dictionary 81 (1984) (defining "advocacy" as "[a]ctive support, as of a cause"); Webster's Ninth New Collegiate Dictionary 59 (1986) (defining "advocacy" as "the act or process of advocating: support").[5]  That this phrase is sufficiently concise is demonstrated by the consistency with which it was interpreted: there was no evidence presented that any of the groups allowed to use the NDSS office attempted to promote issues or causes, just as there was no credible evidence that FAIR intended to do anything else.[6]

_____

[5]In Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 811-12 (1985), the Supreme Court had no difficulty in comprehending the meaning or parameters of this phrase.  The Court, considering the argument that "a decision to exclude all advocacy groups, regardless of political or philosophical orientation, is by definition viewpoint neutral," stated that "we accept the validity and reasonableness of the justifications offered by [the government] for excluding advocacy groups."  Id. (remanding for a factual determination of whether viewpoint discrimination had taken place).  At no point did the Supreme Court declare the term "advocacy group" to be vague or overbroad.

[6]The majority does not contend that FAIR was not an advocacy group, and under a common sense definition, FAIR must be considered as such.  At oral argument, FAIR acknowledged that it advocated for changes in legislation.  In addition, FAIR has been a registered lobbyist, has allied itself with one of the major political parties, self-proclaims that the purpose of its existence is to "give low-income families a pro-active voice in Nebraska's Welfare Reform program," Pl. Ex. 4, and sought to distribute postcards for NDSS clients to send to Nebraska legislators.  See FAIR, 890 F. Supp. at 862-63.  The postcards contained specific political requests regarding welfare reform, including "**Please-**-no lifetime limit that will add to homelessness.  **Please**--no orphanages just because we are poor.  **Please**--no new baby penalties (family caps).  Don't punish us because we are born and our parents are poor."  Pl. Ex. 6 (emphasis in original).  To compare FAIR's political advocacy "with expressive activity intended to provide information on meal preparation and the like," FAIR, 890 F. Supp. at 872, is, as noted by the district court, "factually unfounded."  Id.

As the district court noted, the regulation is "clear and simple." FAIR, 890 F. Supp. at 875 n.14. A "direct benefit," under the parameters of the policy, requires that a concrete good or service, including educational or employment opportunities, go directly to welfare recipients and their families. Under consistent NDSS practice, only groups offering such tangible goods, educational or employment opportunities, or volunteer services directly to welfare recipients or their families have been allowed to access the lobby.[7]

Finally, I can perceive no vagueness or ambiguity in the phrase "basic needs." Wusk, through his testimony and the materials he approved for the bulletin board, provided specific examples of these basic needs: employment, nutrition, shelter, clothing, education for children and adults, tax assistance, and essential household appliances. Rather than arguing that NDSS misapplied the policy in this case or suggesting that FAIR meets any comparable basic need, the majority implies that Wusk erred in other applications of the policy by considering the opportunities provided by the Lincoln Children's Museum as meeting a basic need and in concluding that, as a hypothetical example, CPR training did not. See Maj. Op. at 6. I believe that Wusk, a welfare assistance service provider with over two decades of experience, may well have a better notion of what constitutes a "basic need" for Nebraska welfare recipients than does a panel of federal judges. See Trial Tr. at 133 (Testimony of Wusk) (stating that visiting children's museum "allows families to deal with some of the stress that is maybe going on, and low income families [have] very, very few opportunities sometimes to take advantage of some of those cultural things, and this is the way that we do it"). Cf. New York City

---

[7]By contrast, FAIR did not wish to provide any sort of services or products to the welfare recipients, nor did it wish to hire them as employees. Rather, FAIR wished to supply these welfare recipients with political opinions, and with the opportunity to act as a second-party lobbying arm of FAIR.

<u>Unemployed & Welfare Council v. Brezenoff</u>, 742 F.2d 718, 723 (2d Cir. 1984) (Welfare agency "has much more experience managing welfare offices than the courts have and must be given some discretion in determining what its interests are and how best to further them."). In any event, a disagreement over whether allowing impoverished children to access a children's museum meets a basic psychological or educational need hardly renders a policy vague.

These phrases, taken separately, are not vague, and they are even less so when considered as a whole, in light of the purpose of the policy and in the context of a welfare office. The NDSS office neither "formulates or debates public policy," <u>FAIR</u>, 890 F. Supp. at 863, but rather provides "a broad range of services to welfare recipients," <u>id.</u> The purpose of "the policy was to minimize the numbers of groups allowed access [to the office] as much as possible," <u>id.</u> at 865 (quotations and citations to record omitted), in order to limit congestion in the lobby and to ensure the dignified treatment of NDSS clients by not "forc[ing] NDSS customers to encounter individuals promoting a particular political point of view in order to obtain the necessities of life," <u>id.</u> at 866. Under these circumstances, the clauses in the policy are sufficiently well-defined, as is demonstrated by the consistency with which the policy has been applied. I must echo the Supreme Court in concluding that the provisions of this policy, while they "may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." <u>Letter Carriers</u>, 413 U.S. at 579.

**IV.**

Because the NDSS policy is not vague, it is necessary to determine whether, as applied, the policy is unconstitutional.

While I agree with the district court and the majority that FAIR wished to engage in expressive conduct generally protected by the First Amendment, this determination only begins an analysis of whether the First Amendment was violated by the NDSS office's policy.[8]

It is fundamental that the "existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983). In Perry, the Supreme Court described three categories of public fora. In traditional public fora, such as streets and parks, expressive rights receive the greatest degree of protection:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. . . . [In] public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

_____

[8]Although declining to analyze the forum involved in this case, the majority, citing to McIntyre v. Ohio Elections Comm'n, 115 S. Ct. 1511 (1995), seems to suggest that a heightened standard of scrutiny should apply to NDSS's policy because FAIR wished to engage in "core speech." See Maj. Op. at 10-11. McIntyre, however, did not involve the regulation of speech in a nonpublic forum, but rather a general prohibition on anonymous political advertisements. See McIntyre, 115 S. Ct. at 1514-15 n.3 (quoting statute). In a nonpublic forum, "core speech" may be regulated, and prohibited, so long as the regulation is reasonable and viewpoint neutral. See, e.g., Greer v. Spock, 424 U.S. 828, 838 (1976) (there is "no generalized constitutional right to make political speeches or distribute leaflets at" a nonpublic forum).

-21-

Id. at 45 (citations omitted).  See also International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678-79 (1992) (describing categories of fora).  The second category of fora, the designated public forum, "consists of public property which the State has opened for use by the public as a place for expressive activity."  Perry, 460 U.S. at 45.  So long as the state maintains a forum that is generally open to the public, it is "bound by the same standards as apply in a traditional public forum," id. at 46, and a "content-based prohibition must be narrowly drawn to effectuate a compelling state interest," id.  See also Cornelius, 473 U.S. at 800 ("[W]hen the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest.").

The third category of fora, the nonpublic forum, consists of all other public property.  See Lee, 505 U.S. at 678-79. "Public property which is not by tradition or designation a forum for public communication is governed by different standards."  Perry,  460 U.S. at 46.  These standards reflect the recognition that

> the First Amendment does not guarantee access to property simply because it is owned or controlled by the government.  In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.  As we have stated on several occasions, the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.

Id. at 46 (quotations and citations omitted).  See also Cornelius, 473 U.S. at 799-800 ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that

might be caused by the speaker's activities."); <u>Greer v. Spock</u>, 424 U.S. 828, 836 (1976) ("The guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.") (quotations and citation omitted).

In distinguishing between a traditional public and designated public fora, the Court in <u>Lee</u> explained that a traditional public forum has

> immemorially been held in trust for the use of the public and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. . . . [A] traditional public forum is property that has as a principal purpose . . . the free exchange of ideas.

505 U.S. at 679 (quotations and citations omitted). By contrast, a designated public forum is public property where the government intentionally allows discourse. The <u>Lee</u> Court explained that

> consistent with the notion that the government--like other property owners--has power to preserve the property under its control for the use to which it is lawfully dedicated, the government does not create a public forum by inaction. Nor is a public forum created whenever members of the public are permitted freely to visit a place owned or operated by the Government. The decision to create a public forum must instead be made by intentionally opening a nontraditional forum for public discourse. . . . [T]he location of property also has bearing because separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction.

<u>Id.</u> at 679-80 (citations and quotations omitted).[9]

---

[9]<u>Lee</u> held that a public airport is not a traditional or designated public forum, and upheld a ban on solicitation. <u>See</u> 505 U.S. at 683, 685. In <u>International Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 830, 831 (1992) (per curiam) (<u>Lee II</u>), a companion case to <u>Lee</u>, the Court held that a ban on the distribution of literature in the airport was nevertheless unconstitutional, and relied by reference on various concurring and dissenting opinions in <u>Lee</u>, which had disagreed with the majority's

FAIR does not contend that the NDSS office is a traditional public forum, see Appellant's Br. at 31 ("plaintiffs agree that the lobby of the Lancaster County Office of the Nebraska Department of Public Services is not a traditional public forum"), and I agree. There was no evidence presented that the NDSS office has traditionally been used for public expression and, rather than having as a principal purpose the free exchange of ideas, the NDSS office is used to distribute "a broad range of services to welfare recipients." FAIR, 890 F. Supp. at 863.

Nor has the NDSS office been intentionally opened to public discourse. There was no evidence presented that the NDSS office has a policy of free access for expressive activities. Rather, as found by the district court, NDSS's "policy was to resist opening the waiting/reception area 'up for the world.' [Trial Tr. at 120.] In fact, the policy was to 'minimize the numbers of groups' allowed access 'as much as possible.' [Trial Tr. at 150-51.]" FAIR, 890

---

forum analysis.

In the instant case, the district court undertook an analysis of the forum under the tests enunciated by the majority in Lee as well as the principle concurrence, and concluded that the result-- that the NDSS local office lobby was a nonpublic forum--was the same under both. See FAIR, 890 F. Supp. at 868-74. I agree with the district court that either test would achieve the identical result, and I agree that the Court could have been clearer in its directives in this area. See, e.g., AIDS Action Comm. of Mass. v. MBTA, 42 F.3d 1, 9 (1st Cir. 1994) (describing "the relatively murky status of the public forum doctrine"); Jacobsen v. United States Postal Serv., 993 F.2d 649, 655 n.2 (9th Cir. 1992) (noting that, as a result of the Lee and Lee II decisions, "the jurisprudence in this area is now quite muddied"). I believe, however, that the district court's duplication of effort was unnecessary. Chief Justice Rehnquist's opinion in Lee, which clearly set out the mechanics of forum analysis, commanded a majority of the Court, and Lee II in no way overruled its companion case. Because of this, I will only apply the majority test from Lee.

-24-

F. Supp. at 871.  FAIR contends, however, that in allowing groups like Head Start to distribute materials at the office, NDSS necessarily created a designated public forum.  I disagree.

"[A] practice of allowing some speech activities on [government] property do[es] not add up to the dedication of [government] property to speech activities."  United States v. Kokinda, 497 U.S. 720, 730 (1990) (plurality opinion).  The only groups allowed access to the NDSS office, "[j]ust like NDSS, . . . provided basic social services to welfare recipients."  FAIR, 890 F. Supp. at 871.[10]  Where "government property is not dedicated to open communication the government may--without further justification--restrict use to those who participate in the forum's official business."  Perry, 460 U.S. at 53 (note omitted).[11]

---

[10]While at trial there was some testimony that a group of Girl Scouts had, several years before, used the NDSS office when it was housed in a different building, see Trial Tr. at 82 (Testimony of Stippel), the district court found that "Wusk specifically denied allowing the Girl Scouts access to the waiting/reception area to hand out materials."  FAIR, 890 F. Supp. at 866 n.4.  The majority, while criticizing the district court, see Maj. Op. at 4-5 n.2, fails to discern clear error in this finding.  Because "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse," Cornelius, 473 U.S. at 802, the alleged presence of the Girl Scouts is largely irrelevant to this analysis.

[11]In Greer, the Supreme Court held that a military base was not a designated public forum, and that a prohibition on political campaigning on the base was reasonable.  In reaching this decision, the Court explained:

> The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there.  The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities

Because the "providers of information on nutrition and the like were participating with the agreement of welfare officials in the welfare office's official business--the provision of basic social services to welfare recipients . . . the use of the property by groups such as the county extension agency providing nutritional information does not transform the property into a public forum." FAIR, 890 F. Supp. at 872. I must therefore agree with the district court that the NDSS office was not a designated public forum.

**V.**

Because the NDSS office was neither a traditional public forum nor a designated public forum,

> the regulation at issue must be analyzed under the
> standards set forth for nonpublic fora: It must be
> reasonable and not an effort to suppress expression
> merely because public officials oppose the speaker's
> view. Indeed, control over access to a nonpublic forum
> can be based on subject matter and speaker identity so
> long as the distinctions drawn are reasonable in light of
> the purpose served by the forum and are viewpoint
> neutral. The Government's decision to restrict access to
> a nonpublic forum need only be reasonable; it need not be
> the most reasonable or the only reasonable limitation.

Kokinda, 497 U.S. at 730 (quotations and citations omitted; emphasis in original). See also Perry, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended

---

powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.

424 U.S. at 838 n.10.

purpose of the property.  The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.").  In addition, "[c]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." Kokinda, 497 U.S. at 732 (quotations and citations omitted).

## A.

The NDSS office's policy in this case is clearly reasonable.  The official business of the NDSS office is to provide services to welfare recipients.  See FAIR, 890 F. Supp. at 872.  In light of this official business, it is reasonable for NDSS to allow access to the office to groups which provide direct benefits which meet welfare recipients' basic needs, because this allows NDSS to fulfill its mission.  It is also reasonable for NDSS to prohibit access by all other groups, because this prevents congestion.  Cf. Lee, 505 U.S. at 683-84 (restriction on solicitation reasonable because it limits disruption).[12]  Similarly, a prohibition of

_____

[12]Wusk described the conditions of the NDSS office, and the concerns over congestion:

> We also have large groups of people at different times during the month.  The first five working days are usually very hectic.  In the first three working days, for instance, in March, we over-the-counter issued to about 1,920 households.  That's for sure at least one individual, but many people don't come just by [them]selves.  They come with children, they may come with a significant other, they may come with a grandparent and so the 1,920 [households are] really magnified by many other people.  Also, we do business on those days' business, meaning that we do . . . quarterly reviews, six-month reviews, yearly reviews, depending on what program you're in and how you're set up.  These continue on an ongoing basis, plus we have new applicants

that walk in on a daily basis wanting to apply for food stamps or ADC or one of the other programs, so it becomes a high traffic area, so we have taken a look and said we are not really wanting to

-27-

expressive activities by advocacy groups is also reasonable; NDSS's "position as a government controlled and financed public facility, used daily by thousands of people, ma[kes] it highly advisable to avoid the criticism and embarrassments of allowing any display seeming to favor any political view."  Lebron, 69 F.3d at 658 (upholding AMTRAK's restriction on political advertisements as reasonable).[13]  Finally, NDSS's prohibition on advocacy groups is also reasonable as an effort to treat NDSS clients with dignity and to prevent their coercion.  As found by the district court,

> In this case, the waiting/reception area is filled with some of the most underprivileged in our society seeking benefits from the state for the most basic necessities of life. . . . [T]hese waiting/reception areas are not public or limited public forums but are, indeed, but holding stations for the most pitiful captive audiences in our country.

---

open it up for the world.

Trial Tr. at 120.

[13]FAIR intended to engage in a totally different type of expressive activity than that practiced by the groups allowed access to the NDSS office.  As found by the district court, "one type of speech is intended to persuade on issues of public policy, while the other is intended to convey factual information on basic human needs totally unrelated to public policy."  FAIR, 890 F. Supp. at 872.  These different types of speech could have, as noted by the district court, different impacts on the NDSS office:

> Stippel testified that when she engaged in [FAIR's] proposed expressive activity on the sidewalk in front of the building where NDSS was situated, she encountered "problems" when "we gave the information to somebody that didn't agree with our side," which in turn caused "heavy discussions." [Trial Tr. at 89.]  It is inconceivable that the provision of information about recipes, how to fill out tax form 1040-EZ, or how to register for a prekindergarten or GED program would cause a "problem" involving a "heavy discussion."

Id.

These individuals--some of whom need protective services because of mental impairments, and all of whom need state assistance for some or all of the necessities of life--are peculiarly susceptible to coercion, whether subtle or overt, regarding, among other things, public-policy issues. This is true both because of the welfare recipients' unfortunate stations in life and because of the captive nature of their attendance at the welfare office.

FAIR, 890 F. Supp. at 873-74 (quotations and citation omitted). See also Brezenoff, 742 F.2d at 722 (welfare recipients "may well be peculiarly susceptible to verbal misrepresentations, whether because of the noisy and crowded atmosphere of [a welfare office] lobby, language barriers, or even a misperceived need to do anything necessary to ensure the receipt of welfare checks or to lessen the wait in [the welfare office]").[14]

---

[14]Wusk testified regarding the need to preserve the dignity of NDSS clients:

When customers come to the Department of Social Services to apply for ADC or food stamps or Medicaid, in Lancaster County, at least, they have no other choice. We are the only office that offers those types of services. We do very few applications external to the [local office]. So when those folks come, they are a captive audience. We really believe that we need to treat them with dignity and treat them with respect, and I can require, within my office, my staff to do that, and, in fact, I make it mandatory. There is no exception to that. When they come, I believe they--that our customers have expectations that they should not have to go through a large group of people [sitting] wanting to give them information because they usually come with very specific reasons in mind. I need food, I need shelter, I need clothing, I need medical, and when we start to put large groups or other groups in there offering literature and those kinds of things, it's easy to infringe on my customers' rights.

Trial Tr. at 119-20.

The reasonableness of NDSS's policy is further supported because there are "substantial alternative channels that remain

open" to FAIR to disseminate its message. Perry, 460 U.S. at 53. FAIR has access to the sidewalks outside of the building housing the NDSS office, see FAIR, 890 F. Supp. at 876, as well as other public fora. Although FAIR would undoubtedly prefer the opportunities presented by a captive audience in the NDSS office, "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." Cornelius, 473 U.S. at 809.

**B.**

There is no clear error in the district court's finding that NDSS's policy "is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." FAIR, 890 F. Supp. at 877 (quoting Lee, 505 U.S. at 679). As noted by the district court,

> The evidence establishes without contradiction that Wusk enforced the regulation without regard to whether he agreed or disagreed with the message of the speaker. [Trial Tr. at 134.] In fact, the evidence establishes that Wusk enforced the regulation against a group he belonged to and supported. [Trial Tr. at 140.]

Id. While the NDSS policy's prohibition of access to the NDSS office by outside advocacy groups does distinguish on the basis of message content, this is not synonymous with viewpoint discrimination. The Supreme Court has held that

> in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

-31-

Rosenberger v. Rector & Visitors of Univ. of Va., 115 S. Ct. 2510, 2517 (1995).

The NDSS policy allowed expressive activities which provided a direct benefit meeting welfare recipients' basic needs. The content of FAIR's message was political advocacy--a type of speech not allowed by NDSS's policy. Because FAIR's viewpoint was irrelevant to the decision to disallow its access to the NDSS office, there was no viewpoint discrimination. Because the NDSS policy is otherwise reasonable, the policy does not violate the First Amendment.[15]

## VII.

Because FAIR has no First Amendment right to access the NDSS office, its equal protection argument must fail unless FAIR can show that it is similarly situated to those groups allowed access. See Perry, 460 U.S. at 54-55. Because FAIR is an advocacy group which does not provide a direct benefit which meets welfare recipients' basic needs, it is not similarly situated to those groups allowed access to the NDSS office. NDSS has therefore not violated FAIR's right to equal protection in this case.

---

[15]Similarly, NDSS's restrictions on FAIR's access to the NDSS office's bulletin boards was reasonable. As found by the district court,

> The fact is that space on the bulletin boards is quite limited as they are small. [Trial Tr. at 132.] Indeed, in the photos introduced into evidence, the bulletin-board space appears almost entirely devoted to social- service notices. (Ex. 1, Prelim. Hr'g (photos)). Consequently, if they honored Plaintiffs' request, Defendants [NDSS] would undoubtedly be confronted with similar requests by other advocacy groups, resulting . . . in lurking doubts about favoritism, and sticky administrative problems in parceling out limited space to eager politicians.

FAIR, 890 F. Supp. at 876 (quotations & citation omitted).

## VIII.

Because the NDSS office is a nonpublic forum, and the policy regulating expressive activities in the NDSS office is reasonable, not based on viewpoint, and not vague, I would affirm the district court. In reversing the district court, the majority has usurped the fact-finding function of the district court, misapplied the law, and opened a nonpublic forum to the world at large. I dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.